Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANAND ROY, derivatively on behalf of SUPER MICRO COMPUTER, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHARLES LIANG, SARA LIU, DANIEL W. FAIRFAX, TALLY LIU, SHERMAN TUAN, JUDY LIN, ROBERT BLAIR, YIH-SHYAN LIAW, SHIU LEUNG CHAN, MICHAEL S. MCANDREWS, HWEI-MING TSAI, SARIA TSENG, and DAVID WEIGAND, <br><br> Defendants, <br><br> and <br><br> SUPER MICRO COMPUTER, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Super Micro Computer, Inc. ("Super Micro" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Charles Liang ("Liang"), Sara Liu ("S. Liu"), Daniel W. Fairfax ("Fairfax"), Tally Liu ("T. Liu"), Sherman Tuan ("Tuan"), Judy Lin ("Lin"), Robert Blair ("Blair"), Yih-Shyan Liaw ("Liaw"), Shiu Leung Chan ("Chan"), Michael S. McAndrews ("McAndrews"), Hwei-Ming Tsai ("Tsai"), Saria Tseng ("Tseng"), and David Weigand ("Weigand") (collectively, the "Individual Defendants," and together with Super Micro, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Super Micro, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Liang and Weigand for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Super Micro, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 2, 2021 through October 30, 2024,

inclusive (the "Relevant Period").

2.      Super Micro is a Delaware-incorporated company with headquarters in San Jose, California that represents itself to be a "provider of accelerated compute platforms that are application-optimized high performance and high-efficiency server and storage systems for a variety of markets," including "enterprise data centers, cloud computing, artificial intelligence ('AI'), 5G and edge computing."[1] The Company states that its Total IT Solutions "include complete servers, storage systems, modular blade servers, blades, workstations, full rack scale solutions, networking devices, server sub-systems, server management and security software."[2]

3.      During the Relevant Period, Defendants repeatedly represented to the Company's investors that Super Micro's revenues were growing and product shipment volumes were increasing, whilst simultaneously assuring investors that the Company had effective internal controls over financial reporting and that its financial statements complied with U.S. Generally Accepted Accounting Principles ("GAAP"). In addition, Defendants also represented that Super Micro had complied with relevant trade control regulations, repeatedly affirming that the Company sold no products in the Russian Federation during its 2023 and 2024 fiscal years and, further, that neither Super Micro nor its subsidiaries sold products or provided services to the Russian Federal Security Service ("FSB").

4.      However, these statements failed to disclose, *inter alia*, that the Company did not have effective internal controls over financial reporting, that the Company had been accused of accounting violations by a former employee and whistleblower, and that the Company had been violating U.S. export controls by continuing its sales in Russia between February 2022 and June 2024.

---

[1]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001375365/000137536523000036/smci-20230630.htm

[2] *Id.*

5.      The truth began to emerge on August 27, 2024 when Hindenburg, an investor research firm, published a report titled *Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at this AI High Flyer* (the "Hindenburg Report"). The Hindenburg Report revealed "glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and export control failures, and customer issues" at Super Micro. In particular, the Hindenburg Report disclosed that the Company had engaged in a fraudulent scheme with respect to its revenue recognition, which included: (a) misallocating revenue to hardware sales instead of services in the quarter ending December 2020 to artificially inflate profit margins; (b) recording revenue prematurely, even when installation and delivery of equipment to customers was not feasible; and (c) booking revenue early for faulty or incomplete products not yet ready for sale.

6.      The Hindenburg Report also disclosed that the Company had violated various U.S. export controls. Indeed, despite Defendants having repeatedly claimed throughout the Relevant Period that Super Micro had halted its sales to Russia following the 2022 invasion of Ukraine, the Hindenburg Report disclosed that, between February 24, 2022 and June 30, 2024, the Company had circumvented U.S. export controls and ***shipped approximately $210 million worth of products to Russia***.

7.      On this news, the price per share of the Company's stock dropped 2.64%, to close at a price of $547.64 per share on August 27, 2024.

8.      Later, on August 28, 2024, the Company published a press release revealing that it would delay the filing of its annual report on Form 10-K with the SEC for the 2024 Fiscal Year, as Super Micro was examining the "design and operating effectiveness of its internal controls over financial reporting."

9.      On this news, the price per share of the Company's stock fell 19.02%, from a closing price of $547.64 per share on August 27, 2024 to close at a price of $443.49 per share on August 28, 2024.

10.    The truth continued to emerge on September 26, 2024 when *The Wall Street Journal* published an article reporting that the U.S. Department of Justice ("DOJ") had begun an investigation into the Company, which reportedly focused on allegations made by a whistleblower and former Super Micro employee who accused Super Micro of accounting violations.

11.    On this news, the price per share of the Company's common stock fell 12.17%, from a closing price of $458.10 on September 25, 2024 to close at a price of $402.40 per share on September 26, 2024.

12.    The truth fully emerged on October 30, 2024 when Super Micro filed a Form 8-K with the SEC revealing that Ernst & Young ("EY") had resigned from its position as Super Micro's auditor while conducting Super Micro's audit for the fiscal year ended June 30, 2024 (the "2024 Fiscal Year"). The 8-K stated that EY "was engaged on March 15, 2023 to perform an audit" for Super Micro's 2024 Fiscal Year but, in July 2024, had "communicated to the Audit Committee concerns about several ***matters relating to governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting***"[3] and further that, due to the foregoing, "the timely filing of the Company's annual report was at significant risk."

13.    In response to this communication, Super Micro reported in the 8-K that the Board appointed an independent special committee of the Board (the "Special Committee") "to review the matters and certain of the Company's internal controls and certain governance procedures" (the "Review"). However, "[a]fter receiving additional information through the Review process," the 8-K revealed that "***EY informed the Special Committee that the additional information EY received raised questions,***" including about whether Super Micro ***"demonstrates a commitment to integrity and ethical values consistent with Principle 1 of the COSO Framework,"***; about ***"the ability and willingness***

---

[3] All emphasis has been added unless otherwise noted herein.

*of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management in accordance with Principle 2 of the COSO Framework, and whether EY could rely on representations from certain members of management and from the Audit Committee.*"

14.     EY wrote in its resignation letter that, "We are resigning due to information that has recently come to our attention *which has led us to no longer be able to rely on management's and the Audit Committee's representations and to be unwilling to be associated with the financial statements prepared by management, and after concluding we can no longer provide the Audit Services in accordance with applicable law and professional obligations.*"

15.     On this news, the price per share of the Company's stock fell $16.05, or approximately 33%, from a closing price of $49.12 on October 29, 2024 to close at a price of $33.07 on October 30, 2024.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to Super Micro by participating in and/or causing the Company to participate in a scheme to circumvent U.S. export controls and *ship approximately $210 million worth of products to Russia* between February 24, 2022 and June 30, 2024 (the "Export Control Misconduct").

17.     During the Relevant Period, the Individual Defendants also breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's reported revenues, earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about

related parties and related party transactions from investors. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

18.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Super Micro to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.

19.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, four of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of approximately $3.2 million.

20.    Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

21.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to four federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, the need to conduct the Review, losses from the waste of corporate assets, losses from the DOJ investigation into the Company, losses from EY's resignation as the Company's auditor, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

22.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of EY's determination that it would "***no longer be able to rely on management's and the Audit Committee's representations***" and EY's related skepticism with respect to "***"the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management,"*** of the substantial likelihood of the directors' liability in this derivative action and of Defendant Liang's and Defendant Weigand's liability in the Securities Class Actions, of their engagement and/or participation in causing the Company's engagement in the Export Control Misconduct, of their ability to materially benefit in the future due to shareholders' approval of the amendments to the Plan, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.    Plaintiff is a current shareholder of Super Micro. Plaintiff has continuously held Super Micro common stock at all relevant times.

### Nominal Defendant Super Micro

29.    Super Micro is a Delaware corporation with its headquarters at 980 Rock Avenue, San Jose, California 95131. Super Micro's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "SMCI."

### Defendant Liang

30.    Defendant Liang co-founded Super Micro and has served as the Company's President, CEO, and Chairman of the Board since its inception in September 1993. According to the Schedule 14A the Company filed with the SEC on December 8, 2023 (the "December 2023 Proxy Statement"), as of November 24, 2023, Defendant Liang beneficially owned 7,815,881 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant Liang owned approximately $223.3 million worth of Super Micro common stock as of that date.[4]

---

[4] The Form 8-K the Company filed with the SEC on September 27, 2024 stated: "On September 30, 2024, the Company filed an amendment to the Company's Amended and Restated Certificate of Incorporation (the 'Amendment') with the Secretary of State of the State of Delaware to effect a ten-for-one forward split (the 'Stock Split') of the Company's common stock, par value $0.001 per share (the 'Common Stock'), without any change to its par value. [] The Stock Split became effective at 5:00 p.m. Eastern Time on September 30, 2024 (the 'Effective Time'). Trading in the Common Stock on the Nasdaq Global Select Market is expected to commence on a Stock Split-adjusted basis at the market open on October 1, 2024, under the existing trading symbol 'SMCI.' The new CUSIP number for the Common Stock following the Stock Split is 86800U302. As a result of the Stock

31.    For the fiscal year ended June 30, 2023 (the "2023 Fiscal Year"), Defendant Liang received $1 in total compensation from the Company, consisting entirely of salary. For the fiscal year ended June 30, 2022 (the "2022 Fiscal Year"), Defendant Liang received $1 in total compensation from the Company, consisting entirely of salary. For the fiscal year ended June 30, 2021 (the "2021 Fiscal Year"), Defendant Liang received $18,098,671 in total compensation from the Company. This included $421,785 in salary, $3,360 in bonus, $11,616,000 in option awards, and $6,057,526 in non-equity incentive plan compensation.

32.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Liang made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-04-29 | 525 | 866.92 | 455,132 |
| 2024-01-29 | 962 | 476.10 | 458,008 |

Thus, in total, before the fraud was exposed, Defendant Liang sold 1,487 shares of Company stock on inside information, for which he received approximately $913,140 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33.    The December 2023 Proxy Statement stated the following about Defendant Liang:

---

Split, every one (1) share of Common Stock issued and outstanding was automatically divided into ten (10) shares of Common Stock. The Stock Split does not modify any rights or preferences of the shares of the Common Stock. Proportionate adjustments were automatically made to the number of shares of Common Stock underlying the Company's outstanding equity awards, equity incentive plans, and other existing agreements, as well as exercise or conversion prices, as applicable." Plaintiff's calculations of each Individual Defendant's stock ownership contained herein are based on a closing price of $28.57 on November 24, 2023, which closing price accounts for the October 2024 Stock Split (*i.e.,* prior to the Stock Split, this closing price was $285.70 per share).

*Charles Liang* founded Super Micro and has served as our President, Chief Executive Officer and Chairman of the Board since our inception in September 1993. Mr. Liang has been developing server and storage system architectures and technologies for the past three decades. From July 1991 to August 1993, Mr. Liang was President and Chief Design Engineer of Micro Center Computer Inc., a high-end motherboard design and manufacturing company. From January 1988 to April 1991, Mr. Liang was Senior Design Engineer and Project Leader for Chips & Technologies, Inc., a chipset technology company, and Suntek Information International Group, a system and software development company. Mr. Liang has been granted 23 U.S. server technology patents. Mr. Liang holds an M.S. in Electrical Engineering from the University of Texas at Arlington and a B.S. in Electrical Engineering from National Taiwan University of Science & Technology in Taiwan. Our Governance Committee concluded that Mr. Liang should serve on the Board based on his skills, experience and qualifications in managing technology businesses, his technical expertise, and his long familiarity with our company's business.

**Defendant Weigand**

34.    Defendant Weigand has served as the Company's Senior Vice President, CFO since February 2021. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant Weigand beneficially owned 53,130 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant Weigand owned approximately $1.5 million worth of Super Micro common stock as of that date.

35.    For the 2023 Fiscal Year, Defendant Weigand received $1,859,089 in total compensation from the Company. This included $522,151 in salary, $148,568 in bonus, $1,021,243 in stock awards, and $167,127 in non-equity incentive plan compensation. For the 2022 Fiscal Year, Defendant Weigand received $2,204,033 in total compensation from the Company. This included $442,601 in salary, $285,050 in bonus, $353,404 in stock awards, $1,074,005 in option awards, and $48,973 in non-equity incentive plan compensation. For the 2021 Fiscal Year, Defendant Weigand received $633,537 in total compensation from the Company. This included $367,709 in salary, $43,360 in bonus, $109,188 in stock awards, and $113,280 in option awards.

36.    The Company's website states the following about Defendant Weigand:

David Weigand was appointed Senior Vice President, Chief Financial Officer in February 2021. Before taking on this role, he has served as Senior Vice President and Chief Compliance Officer since May 2018. Prior to his employment with our company, Mr. Weigand was a Vice President at Hewlett Packard Enterprise (HPE) from November 2016 until April 2018 and served as Vice President, Tax at Silicon Graphics International, Inc., from September 2013 until its acquisition by HPE in November 2016. Before that, he was Vice President, Chief Financial Officer of Renesas Electronics America, a semiconductor company formed by the merger of the semiconductor businesses of NEC Corporation, Hitachi, and Mitsubishi Electric from October 2010 until April 2013, and Vice President, Controller of NEC Electronics America from October 2004 until September 2010. Mr. Weigand holds a M.S. degree in Taxation from the University of Hartford and a B.S. degree in Accounting from San Jose State University and is a Certified Public Accountant in California (Inactive).

**Defendant Blair**

37.    Defendant Blair has served as a Company director since December 2022. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant Blair beneficially owned 1,386 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant Blair owned approximately $39,598 worth of Super Micro common stock as of that date.

38.    For the 2023 Fiscal Year, Defendant Blair received $149,015 in total compensation from the Company. This included $32,120 in fees earned or paid in cash and $116,895 in stock awards.

39.    The December 2023 Proxy Statement stated the following about Defendant Blair:

*Robert Blair* has been a member of our Board since December 2022. Mr. Blair was President and Chief Executive Officer of ESS Technology, Inc., a fabless semiconductor company for 19 years from September 1999 through July 2018 where he also served as a director from September 1999 through August 2019.

During this time, ESS Technology, Inc. was a publicly listed company on NASDAQ for 9 years. Mr. Blair has been a director of Pictos, Inc., a technology licensing company that owns a portfolio of fundamental CMOS imaging patents, since July 2008 where he also previously served as President and Chief Executive Officer between 2008 and 2013. His professional background also includes more than 35 years of experience in marketing, sales, engineering, operations, and general management, principally in the computer hardware, software, and semiconductor industries. His experience includes roles at Global Semiconductor Alliance, Logistix Corporation, and XEGMAG (a division of Xidex Corporation). Mr. Blair holds twelve issued U.S. patents plus additional patents worldwide, and studied electrical engineering at Arizona State University and applied economics at the University of San Francisco. Our Governance Committee concluded that Mr. Blair should serve on the Board based on his familiarity with technology businesses, skills and experience with business operations at technology companies, and public company experience.

**Defendant Chan**

40.    Defendant Chan served as a Company director from October 2020 until he resigned on March 11, 2024. Prior to his resignation, Defendant Chan served as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant Chan beneficially owned 40,917 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant Chan owned approximately $1.2 million worth of Super Micro common stock as of that date.

41.    For the 2023 Fiscal Year, Defendant Chan received $311,979 in total compensation from the Company. This included $92,000 in fees earned or paid in cash and $219,979 in stock awards. For the 2022 Fiscal Year, Defendant Chan received $308,899 in total compensation from the Company. This included $88,750 in fees earned or paid in cash, $219,969 in stock awards, and $180 in all other compensation. For the 2021 Fiscal Year, Defendant Chan received $188,705 in total compensation from the Company. This included $40,435 in fees earned or paid in cash and $148,270 in stock awards.

42.    The December 2023 Proxy Statement stated the following about Defendant Chan:

> *Shiu Leung (Fred) Chan* has been a member of our Board since October 2020. Mr. Chan is the founder and currently the president of KCR Development, Inc. which has developed real estate projects in excess of $1 billion in California and Hawaii specializing in high-density residential and retail projects. Mr. Chan also has more than three decades of experience in the high technology sector and as an entrepreneur. He most recently served as chairman of ESS Technology, Inc., a privately held semiconductor company which he had founded, from 2015 to 2019. ESS Technology was previously a public company listed on Nasdaq from 1995 until 2008, where he had held a variety of senior executive roles, including as chairman, president and chief executive officer, and served as a director. Mr. Chan has also previously served as chairman of a privately-held consumer electronics company, founder and an executive officer of a VLSI chip design center providing computer aided design, engineering and other design services, and co-founder and an executive officer of a company in the business of computer aided engineering systems development. Mr. Chan holds B.S.E.E. and M.S.C. degrees from the University of Hawaii. Our Governance Committee concluded that Mr. Chan should serve on the Board based on his skills and experience in growing companies and familiarity with technology businesses.

**Defendant Fairfax**

43.    Defendant Fairfax has served as a Company director since July 2019. He also serves as a member of the Audit Committee and the Compensation Committee. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant Fairfax beneficially owned 20,987 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant Fairfax owned approximately $599,599 worth of Super Micro common stock as of that date.

44.    For the 2023 Fiscal Year, Defendant Fairfax received $317,800 in total compensation from the Company. This included $97,821 in fees earned or paid in cash and $219,979 in stock awards. For the 2022 Fiscal Year, Defendant Fairfax received $307,149

in total compensation from the Company. This included $87,000 in fees earned or paid in cash, $219,969 in stock awards, and $180 in all other compensation. For the 2021 Fiscal Year, Defendant Fairfax received $322,990 in total compensation from the Company. This included $103,000 in fees earned or paid in cash and $219,990 in stock awards.

45.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fairfax made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-06-03 | 300 | 802.00 | 240,600 |
| 2024-05-01 | 300 | 777.36 | 233,208 |
| 2024-04-01 | 300 | 1,010.00 | 303,000 |
| 2024-02-01 | 300 | 540.00 | 162,000 |

Thus, in total, before the fraud was exposed, he sold 1,200 shares of Company common stock on inside information, for which he received approximately $938,808 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

46.    The December 2023 Proxy Statement stated the following about Defendant Fairfax:

> *Daniel Fairfax* has been a member of our Board since July 2019. Mr. Fairfax served as Senior Vice President and Chief Financial Officer of Brocade Communications, a networking equipment company ("Brocade") from June 2011 to November 2017. Brocade was acquired by Broadcom in November 2017. Mr. Fairfax previously served as Brocade's Vice President of Global Services from August 2009 to June 2011 and Brocade's Vice President of Business Operations from January 2009 to August 2009. Prior to Brocade, Mr. Fairfax served as Chief Financial Officer of Foundry Networks, Inc., from January 2007 until December 2008. Foundry Networks was acquired by Brocade in December 2008. Earlier in his career Mr. Fairfax served in executive financial management and/or general management positions at GoRemote Internet

Communications, Ironside Technologies, Acta Technology, NeoVista Software, Siemens and Spectra-Physics. He began his career as a consultant with the National Telecommunications Practice Group of Ernst & Young. Mr. Fairfax is a certified public accountant with an inactive license in California and holds an MBA degree from The University of Chicago Booth School of Business and a Bachelor of Arts degree, with a major in Economics, from Whitman College. Our Governance Committee concluded that Mr. Fairfax should serve on the Board based on his skills, experience, his financial literacy and his familiarity with technology businesses.

**Defendant Liaw**

47.    Defendant Liaw co-founded Super Micro in 1993 and has served as a Company director since December 2023. He previously served as a Company director from 1993 until January 2018. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant Liaw beneficially owned 1,592,998 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant Liaw owned approximately $45.5 million worth of Super Micro common stock as of that date.

48.    The December 2023 Proxy Statement stated the following about Defendant Liaw:

*Yih-Shyan (Wally) Liaw* co-founded Super Micro in September 1993. From our founding until January 2018, Mr. Liaw was an employee and held various executive positions at our company, including Senior Vice President of Worldwide Sales and Corporate Secretary. He was also a member of the Board from 1993 until January 2018. In January 2018, Mr. Liaw resigned from all his positions with our company, including from the Board, during a period when we were not current in our filings with the Securities and Exchange Commission, and, following completion of an Audit Committee investigation, in connection with a restructuring of our sales organization as part of our remediation of material weaknesses in our internal control over financial reporting. From February 2018 until June 2020, Mr. Liaw was retired. From June 2020 until April 2021, Mr. Liaw was the president of 2CRSi Corporation, a company headquartered in Strasbourg, France that develops, produces and sells high-performance customized, environmentally-friendly servers. Mr. Liaw returned to our

company as a consultant in May 2021, advising us with respect to business development matters. In August 2022, Mr. Liaw returned to full-time employment with us as Senior Vice President, Business Development. He was re-appointed to the Board in December 2023. Mr. Liaw holds an M.S. in Computer Engineering from University of Arizona, an M.S. in Electrical Engineering from Tatung Institute of Technology in Taiwan, and a B.S. degree from Taiwan Provincial College of Marine and Oceanic Technology. Our Governance Committee concluded that Mr. Liaw should serve on the Board based on his technical expertise and his long familiarity with our company's business.

**Defendant Lin**

49.    Defendant Lin has served as a Company director since April 2022. She also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant Lin beneficially owned 4,863 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant Lin owned approximately $138,936 worth of Super Micro common stock as of that date.

50.    For the 2023 Fiscal Year, Defendant Lin received $287,479 in total compensation from the Company. This included $67,500 in fees earned or paid in cash and $219,979 in stock awards. For the 2022 Fiscal Year, Defendant Lin received $71,887 in total compensation from the Company. This included $16,875 in fees earned or paid in cash, $54,832 in stock awards, and $180 in all other compensation.

51.    The December 2023 Proxy Statement stated the following about Defendant Lin:

*Judy Lin* has been a member of our Board since April 2022. Ms. Lin is a retired executive who has 30 years of experience in the disk drive industry. She served as an Independent Board Director of MORESCO Corporation, a leading manufacturer of specialty chemicals based in Japan, from June 2014 to May 2022. Ms. Lin served as Vice President of Western Digital Media Operations, a leader in data infrastructure, from September 2007 until her retirement in September 2012. Prior to Western Digital, Ms. Lin served as Vice President at Komag Inc., a leading supplier of thin-film

disks to the hard disk drive industry and held various management positions from April 1994 until Western Digital acquired Komag in September 2007. Before joining Komag, Ms. Lin was with IBM Almaden Research Center Storage Systems Division for 11 years as a Senior Scientist from January 1983 to April 1994. Ms. Lin holds a MSc degree in Materials Science and Mineral Engineering from University of California, Berkeley where she was also a PhD candidate, and a BS in Chemical Engineering from National Cheng Kung University in Taiwan. Our Governance Committee concluded that Ms. Lin should serve on the Board based on her substantial leadership and management experience and, considering she is well versed in technology innovation, product development, engineering and global operations, she will add valuable perspective to the Board.

**Defendant S. Liu**

52.     Defendant S. Liu co-founded Super Micro in 1993 and has served as a Company director since its inception. She also serves as the Company's Senior Vice President. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant S. Liu beneficially owned 7,815,881 shares of the Company's common stock, representing 14.3% of the Company's total common stock outstanding. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant S. Liu owned approximately $223.3 million worth of Super Micro common stock as of that date.

53.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant S. Liu made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-04-29 | 525 | 866.92 | 455,132 |
| 2024-01-29 | 962 | 476.10 | 458,008 |

Thus, in total, before the fraud was exposed, she sold 1,487 shares of Company common stock on inside information, for which she received approximately $913,140 in proceeds.

Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

54.    The December 2023 Proxy Statement stated the following about Defendant S. Liu:

> *Sara Liu* co-founded Super Micro in September 1993, has been a member of our Board since our inception in September 1993 and currently serves as our Co-Founder, Senior Vice President, and a director. She has held a variety of positions with the Company, including Treasurer from inception to May 2019, Senior Vice President of Operations from May 2014 to February 2018, and Chief Administrative Officer from October 1993 to May 2019. From 1985 to 1993, Ms. Liu held accounting and operational positions for several companies, including Micro Center Computer Inc. Ms. Liu holds a B.S. in Accounting from Providence University in Taiwan. Ms. Liu is married to Mr. Charles Liang, our Chairman, President and Chief Executive Officer. Our Governance Committee concluded that Ms. Liu should serve on the Board based on her skills, experience, her general expertise in business and operations and her long familiarity with our company's business.

**Defendant T. Liu**

55.    Defendant T. Liu has served as a Company director since January 2019. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant T. Liu beneficially owned 28,313 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant T. Liu owned approximately $808,902 worth of Super Micro common stock as of that date.

56.    For the 2023 Fiscal Year, Defendant T. Liu received $335,979 in total compensation from the Company. This included $116,000 in fees earned or paid in cash and $219,979 in stock awards. For the 2022 Fiscal Year, Defendant T. Liu received $323,935 in total compensation from the Company. This included $103,786 in fees earned

or paid in cash, $219,969 in stock awards, and $180 in all other compensation. For the 2021 Fiscal Year, Defendant T. Liu received $339,990 in total compensation from the Company. This included $120,000 in fees earned or paid in cash and $219,990 in stock awards.

57.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant T. Liu made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-05-30 | 500 | 839.17 | 419,585 |

Thus, in total, before the fraud was exposed, he sold 500 shares of Company common stock on inside information, for which he received approximately $419,585 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

58.    The December 2023 Proxy Statement stated the following about Defendant T. Liu:

*Tally Liu* was appointed to our Board in January 2019. He has been retired since 2015. Prior to his retirement, Mr. Liu was Chief Executive Officer of Wintec Industries, a supply chain solutions company for high-tech manufacturers, from 2012 to 2015. Prior to Wintec, Mr. Liu served as Chairman of the Board and Chief Executive Officer of Newegg, Inc., an internet consumer technology retailer, from 2008 to 2010, and as President of Newegg in 2008. Prior to Newegg, Mr. Liu held various positions with Knight Ridder Inc., including Vice President, Finance & Advanced Technology and Vice President of Internal Audit. Mr. Liu served as President of the International Newspapers Financial Executives (INFE) for one year before it merged with other media associations. A Certified Public Accountant from 1982-2007, Mr. Liu is a member of the American Institute of Certified Public Accountants (AICPA) with retired status and was previously a member of the Florida Institute of Certified Public Accountants (FICPA). Mr. Liu is also a Certified Information System

Auditor (CISA) and Certified Information Security Manager (CISM), with non-practice status, with the Information Systems Audit and Control Association (ISACA) and has also been certified in Control Self-assessment (CCSA) by the Institute of Internal Auditors (IIA). After earning his BA of Commerce from National Chengchi University, Taipei, Taiwan, and MBA from Florida Atlantic University, Mr. Liu received executive leadership training at the Stanford Advanced Finance Program in 1986 and at Harvard Business School in the Advanced Management Program (AMP) in 1998. Mr. Liu is not related to any member of our Board or any of our officers. Our Governance Committee concluded that Mr. Liu should serve on the Board based on his skills, experience, his financial literacy and his familiarity with technology businesses.

**Defendant McAndrews**

59.    Defendant McAndrews served as a Company director from February 2015 to May 2021.

60.    For the 2021 Fiscal Year, Defendant McAndrews received $378,161 in total compensation from the Company. This included $90,201 in fees earned or paid in cash and $287,960 in stock awards.

**Defendant Tsai**

61.    Defendant Tsai served as a Company director from August 2006 to May 2021.

62.    For the 2021 Fiscal Year, Defendant Tsai received $509,989 in total compensation from the Company. This included $118,934 in fees earned or paid in cash and $287,960 in stock awards.

**Defendant Tseng**

63.    Defendant Tseng served as a Company director from November 2016 to May 2022.

64.    For the 2022 Fiscal Year, Defendant Tseng received $314,510 in total compensation from the Company. This included $68,345 in fees earned or paid in cash, $245,985 in stock awards, and $180 in all other compensation. For the 2021 Fiscal Year, Defendant Tseng received $303,490 in total compensation from the Company. This

included $83,500 in fees earned or paid in cash and $219,990 in stock awards.

**Defendant Tuan**

65.    Defendant Tuan has served as a Company director since February 2007. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the December 2023 Proxy Statement, as of November 24, 2023, Defendant Tuan beneficially owned 30,113 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 24, 2023 was $28.57, Defendant Tuan owned approximately $860,328 worth of Super Micro common stock as of that date.

66.    For the 2023 Fiscal Year, Defendant Tuan received $311,479 in total compensation from the Company. This included $91,500 in fees earned or paid in cash and $219,979 in stock awards. For the 2022 Fiscal Year, Defendant Tuan received $307,649 in total compensation from the Company. This included $87,500 in fees earned or paid in cash, $219,969 in stock awards, and $180 in all other compensation. For the 2021 Fiscal Year, Defendant Tuan received $501,640 in total compensation from the Company. This included $87,500 in fees earned or paid in cash, $219,990 in stock awards, and $194,150 in non-equity incentive plan compensation.

67.    The December 2023 Proxy Statement stated the following about Defendant Tuan:

> *Sherman Tuan* has been a member of our Board since February 2007. Mr. Tuan is founder of PurpleComm, Inc. (doing business as 9x9.tv), a platform for connected TV, where he has served as Chief Executive Officer since January 2005 and Chairman of the Board since June 2003. From September 1999 to May 2002, he was director of Metromedia Fiber Network, Inc., a fiber optical networking infrastructure provider. Mr. Tuan was co-founder of AboveNet Communications, Inc., an internet connectivity solutions provider, where he served as President from March 1996 to January 1998, Chief Executive Officer from March 1996 to May 2002 and director from March 1996 to September 1999. Mr. Tuan holds a degree in Electrical Engineering from Feng-Chia University in Taiwan. Our Governance Committee concluded that Mr. Tuan should serve on the Board based on his skills, experience and

qualifications in managing technology businesses, his technical expertise, and his familiarity with our company's business.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

68.    By reason of their positions as officers, directors, and/or fiduciaries of Super Micro and because of their ability to control the business and corporate affairs of Super Micro, the Individual Defendants owed Super Micro and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Super Micro in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Super Micro and its shareholders so as to benefit all shareholders equally.

69.    Each director and officer of the Company owes to Super Micro and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Super Micro, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

71.    To discharge their duties, the officers and directors of Super Micro were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Super Micro, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should

have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

73.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

74.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Super Micro were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Super Micro's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Super Micro conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Super Micro and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Super Micro's operations would comply with all applicable laws and Super Micro's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.    Each of the Individual Defendants further owed to Super Micro and the shareholders the duty of loyalty requiring that each favor Super Micro's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Super Micro and were at all times acting within the course and scope of such agency.

77.    Because of their advisory, executive, managerial, directorial, and controlling positions with Super Micro, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

78.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Super Micro.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

81.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate

applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Super Micro was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Super Micro and was at all times acting within the course and scope of such agency.

## SUPER MICRO'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Super Micro's Code of Conduct*

84.     Super Micro's Code of Conduct states that the Board adopted the Code of Conduct "for all of its directors, officers, and employees" and further states as follows:

The Code is designed to encourage as reasonably necessary:
• Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;
• Full, fair, accurate, timely and understandable disclosures;
• Compliance with applicable governmental laws, rules and regulations;
• Prompt internal reporting of any violations of law or the Code;
• Accountability for adherence to the Code, including fair process by which to determine violations;
• Consistent enforcement of the Code, including clear and objective standards for compliance; and
• Protection for persons reporting any such questionable behavior

85.    In a section titled "Full, Fair, Accurate, Timely and Understandable Disclosure," the Code of Conduct states:

> All disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company must be full, fair, accurate, timely and understandable. You must take all steps available to assist the Company in these responsibilities consistent with your role within the Company. To ensure that the Company meets this standard, you (to the extent you are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with your duties. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosure. You are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations. The Company's CEO and CFO are responsible for designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of the Company's disclosure controls and procedures (as such term is defined by applicable SEC rules). The Company's CEO, CFO, Controller, General Counsel and such other Company officers designated from time to time by the Audit Committee of the Board of Directors shall be deemed the "Senior Officers" of the Company. Senior Officers shall take all steps necessary or advisable to ensure that all disclosure in reports and documents filed with or submitted to the SEC, and all disclosure in other public communications made by the Company is full, fair, accurate, timely and understandable.

86.    In a section titled "Insider Trading," the Code of Conduct states:

> You should never trade securities on the basis of confidential information acquired through your employment or fiduciary relationship with the Company. You are prohibited under both federal law and Company policy from purchasing or selling Company stock, directly or indirectly, on the basis of material non-public information concerning the Company. Any person possessing material non-public information about the Company must not engage in transactions involving Company securities until this information has been released to the public. Generally, material information is that which would be expected to affect the investment decisions of a reasonable investor or the market price of the stock. You must also refrain from trading in the stock of other publicly held companies, such as existing or potential customers

or suppliers, on the basis of material confidential information obtained in the course of your employment or service as a director. It is also illegal to recommend a stock to (i.e., "tip") someone else, including family members, on the basis of such information or to otherwise disclose non-public financial information for personal financial benefit or to "tip" others who might make an investment decision based on this information. If you have a question concerning appropriateness or legality of a particular securities transaction, consult with the Compliance Officer or the General Counsel. Officers, directors and certain other employees of the Company are subject to additional responsibilities under the Company's insider trading compliance policy.

87.    In a section titled "Fair Dealing," the Code of Conduct states:

Our goal is to conduct our business with integrity. You should deal honestly with the Company's customers, suppliers, competitors and employees. Under federal and state laws, the Company is prohibited from engaging in unfair methods of competition, and unfair or deceptive acts and practices. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing.

88.    In a section titled "Reporting Violations of Company Policies and Receipt of Complaints Regarding Financial Reporting or Accounting Issues," the Code of Conduct states:

You should report any violation or suspected violation of the Code to the appropriate Company personnel or via the Company's anonymous and confidential reporting procedures described below. The Company's efforts to ensure observance of, and adherence to, the goals and policies outlined in the Code mandate that you promptly bring to the attention of the Compliance Officer, any material transaction, relationship, act, failure to act, occurrence or practice that you believe, in good faith, is inconsistent with, in violation of, or reasonably could be expected to give rise to a violation of, the Code. You should also report any suspected violations of the Company's financial reporting obligations or any complaints or concerns about questionable accounting or auditing practices in accordance with the procedures set forth below.

89.    In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct states the following, in relevant part:

You should endeavor to protect the Company's assets and ensure their proper use. Company assets, both tangible and intangible, are to be used only for

legitimate business purposes of the Company and only by authorized employees or consultants. Intangible assets include intellectual property such as trade secrets, patents, trademarks and copyrights, business, marketing and service plans, engineering and manufacturing ideas, designs, databases, Company records, salary information, and any unpublished financial data and reports. Unauthorized alteration, destruction, use, disclosure or distribution of Company assets violates Company policy and this Code. Theft or waste of, or carelessness in using, these assets have a direct adverse impact on the Company's operations and profitability and will not be tolerated.

90.    In a section titled "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

You must avoid any situation in which your personal, family or financial interests conflict or even appear to conflict with the Company's interests. A conflict of interest occurs when your private interests interfere, or appear to interfere, with the interests of the Company as a whole. You owe a duty to the Company not to compromise the Company's legitimate interests and to advance such interests when the opportunity to do so arises in the course of your employment. You shall perform your duties to the Company in an honest and ethical manner. You shall handle all actual or apparent conflicts of interest between your personal and professional relationships in an ethical manner. You may not engage in activities that compete with the Company or compromise its interests. You should not take for your own benefit opportunities discovered in the course of employment that you have reason to know would benefit the Company.

The following are examples of actual or potential conflicts:

• you, or any of your immediate family members, receive improper personal benefits as a result of your position in the Company;

• you use Company's property, information or positions for your personal benefit;

• you engage in activities that interfere with your loyalty to the Company or your ability to perform Company duties or responsibilities effectively;

• you work simultaneously (whether as an employee or a consultant) for a competitor, customer or supplier, or compete with the Company for business opportunities;

• you take for yourself an opportunity that is discovered through the use of Company property, information or positions; or

• you accept compensation, in any form, for services performed for the Company from any source other than the Company.

91.    In violation of the Code of Conduct, the Individual Defendants conducted

Verified Shareholder Derivative Complaint

little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Super Micro's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

### Super Micro's Audit Committee Charter

92.    Super Micro's Audit Committee Charter states that the purpose of the Audit Committee is as follows:

> The primary purpose of the Committee is to oversee the accounting and financial reporting processes of the Company, the integrity of the financial reports and other financial information and the audits of the Company's financial statements. The Committee shall also review the qualifications, independence and performance, and approve the terms of engagement, of the Company's independent auditor and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, assist with Board oversight of the Company's compliance with legal and regulatory requirements, and prepare any reports required of the Committee under rules of the Securities and Exchange Commission ("SEC"). The Committee will also review the qualifications, independence and performance of the Company's internal audit staff.

93.    In a section titled "Review of Financial Reporting Policies and Processes," the Audit Committee Charter states the following:

> To fulfill its responsibilities and duties, to the extent that it deems necessary or appropriate, and in addition to the items described above, the Committee shall:
>
> 1. Review and discuss with the independent auditor any audit problems or difficulties and management's response.

2. Review and discuss with management and the independent auditor the annual audited financial statements to be included in the Company's annual reports on Form 10-K, the quarterly financial statements to be included in the Company's quarterly reports on Form 10-Q, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

3. Review and discuss with management press releases regarding the Company's financial results, as well as financial information and earnings guidance provided to securities analysts and rating agencies.

4. Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

94.    In a section titled "Risk Management, Related Party Transactions, Legal Compliance and Ethics," the Audit Committee Charter states:

In addition, the Committee shall have the following authority and responsibilities:

1. Review any report on significant deficiencies in the design or operation of the Company's internal control structure and procedures for financial reporting ("Internal Controls") that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.

2. Review, discuss and approve the internal audit function's (i) audit plan, (ii) all major changes to the audit plan, (iii) the scope, progress and results of executing the internal audit plan, and (iv) the annual performance of the internal audit function.

3. Periodically review and discuss with management and independent auditors the Company's disclosure controls and procedures and internal control over financial reporting as defined in applicable SEC rules.

4. Review, approve and oversee transactions between the Company and any "related party," as such term is defined in the rules of the Exchange and SEC rules, in accordance with the Company's related party transaction policies and procedures.

5. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls

or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

6. Review and investigate conduct alleged to be in violation of the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary or other measures with respect to such conduct.

7. Periodically review and discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control the exposures, including the Company's risk assessment and risk management guidelines and policies.

8. Prepare the audit committee report required by the rules of the SEC to be included in the Company's annual proxy statement.

95.    In a section titled "Meetings and Committee Action," the Audit Committee Charter states the following, in relevant part:

The Committee shall meet at least once during each fiscal quarter and as often as necessary to carry out its responsibilities. The Committee shall meet periodically with management, the internal auditor, the independent auditor, other directors and committees of the Board, and other Company employees, agents, attorneys, or representatives invited by the Committee in separate executive sessions, as appropriate. The Committee may request any officer or employee of the Company or any of its subsidiaries or request the Company's outside counsel or independent auditor to attend a meeting of the Committee or to meet with any members of, or consultants to, the Committee. Formal action to be taken by the Committee shall be by the affirmative vote of at least a majority of the members present (in person or by telephone conference call) at a meeting at which a quorum is present or by unanimous written consent (which may be provided in writing or by electronic transmission). A quorum shall consist of at least a majority of the members of the Committee. The Committee shall maintain written minutes of its meetings at which formal action is taken and deliver copies of the minutes to the corporate secretary to be filed with the minutes of the meetings of the Board. The Committee shall provide reports, which may be in any form the Committee deems appropriate, regarding the activities of the Committee to the Board. The Committee may establish its own procedures, including the formation and delegation of authority to subcommittees, in a manner not inconsistent with this Charter, the Company's bylaws and the rules of the Exchange.

96.    In a section titled "Review," the Audit Committee Charter states:

The Committee shall review this Charter on at least an annual basis and periodically perform an evaluation of the Committee's performance of its duties. The Committee's evaluation may be conducted in such manner as the Committee, in its business judgment, deems appropriate. Any proposed changes to this Charter or the scope of the Committee's responsibilities, where indicated, shall be referred to the Board for appropriate action.

97.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

### *February 2, 2021 Press Release and February 5, 2021 Form 10-Q*

98.    Super Micro is a Delaware-incorporated company with headquarters in San Jose, California that represents itself to be a "provider of accelerated compute platforms that are application-optimized high performance and high-efficiency server and storage systems for a variety of markets," including "enterprise data centers, cloud computing, artificial intelligence ('AI'), 5G and edge computing."[5] The Company states that its Total IT Solutions "include complete servers, storage systems, modular blade servers, blades,

---

[5]
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001375365/000137536523000036/smci-20230630.htm

workstations, full rack scale solutions, networking devices, server sub-systems, server management and security software."[6]

**Export Control Misconduct**

99.    During the Relevant Period, the Individual Defendants breached their fiduciary duties to Super Micro by participating in and/or causing the Company to participate in the Export Control Misconduct, whereby Super Micro circumvented U.S. export controls and ***shipped approximately $210 million worth of products to Russia*** between February 24, 2022 and June 30, 2024 in violation of federal regulations.

100.    With respect to the Export Control Misconduct, the Hindenburg Report reported the following, in relevant part:

> ***Super Micro products have been shipped to Russia in larger-than-ever volumes since the invasion of Ukraine***, based on our analysis of more than 45,000 import and export transactions provided by trade aggregator Tradesparq.
> . . .
> In calendar year 2023, exports of Super Micro products to Russia rose to $126.6 million – 9.6x higher than in 2021 – per Tradesparq data*. **That value was equivalent to 4.9% of Super Micro´s total worldwide sales, excluding the U.S., in calendar 2023***, per filings
> . . .
> ***We believe that all the common-sense indicators suggest that Super Micro continued to knowingly supply one of its longstanding Russian customers first via a California distributor operated by a key executive of one of its authorized partners and later via a web of Turkish shell companies.***
>
> Trade data shows Super Micro exporting goods directly to Niagara until February 24th, 2022, the day Russia invaded Ukraine.
>
> Then between July 12th, 2022 and February 8th, 2023, a California entity named Business Development International took over exports of Super Micro products to Niagara – in apparent contravention of U.S. trade restrictions – per import-export data.

---

[6] *Id.*

In just a little more than 6 months, Business Development International shipped more than $5.8 million of "computing machine devices", "data processing blocks" and "parts and accessories" solely to Niagara Computers in Russia, per Tradesparq.

. . .

Just as California-based Business Development International's export operations were winding down, three recently-created Turkish companies took over shipping Super Micro products to Niagara.

The largest, Koc Gemicilik Ve Tasimacilik, was incorporated on January 11, 2022 – about five weeks before Russia invaded Ukraine, per the Turkish corporate gazette

. . .

Between March 6, 2023 and December 21, 2023, Koc Gemicilik Ve Tasimacilik exported $32.1 million of Super Micro products solely to Niagara in Russia, per Tradesparq.

In June 2024, Koc Gemicilik Ve Tasimacilik was placed under U.S. sanctions for its role in smuggling restricted items to Russia.

The other two export intermediaries, Alfament Yazilim Teknoloji and AMD Ithalat Ihracat were both incorporated in Turkey within two months of the Russian invasion of Ukraine, per the Turkish corporate gazette.

Neither entity nor their sole shareholders appear to have any significant online presence.

Between January 2023 and October 2023, those two entities shipped a combined $8.3 million of Super Micro components to Niagara, per Tradesparq. The vast majority of those products corresponded to HS trade prefix 8471.50 – items the U.S. says are being diverted for military use.

Newly-created Turkish entities, run by Ukrainian and Russian citizens, with little or no trading history and little or no online presence would have been an unmissable warning sign during even the most rudimentary due diligence and export compliance.

. . .

Between November 2, 2022 and November 14, 2023, Beiliande [an "Authorized Partner" of SMCI via its partnership program] exported Super Micro products with a declared customs value of approximately $10.25 million to Russia – via both its Shenzhen and Hong Kong operations, per Tradesparq.

Verified Shareholder Derivative Complaint

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The largest single Russian customer supplied by Beiliande was called Asilan, based in St Petersburg, which received goods with a declared customs value of about $3.6 million, per Tradesparq.

. . .

Asilian states on the website that it is a partner of Super Micro, provides a link to Super Micro in Holland and features photos with Asilan personnel carrying boxes marked with the Super Micro logo. Its website features multiple links to what it says are Super Micro servers and data storage systems.

. . .

Moscow-based IT distributor Vneshekostil received about $29.4 million of Super Micro products following Russia's 2022 invasion of Ukraine, per Tradesparq. It appears to have had no prior trading relationship with Super Micro and received most of the components via a Hong Kong exporter created seven weeks after the war began.

Vneshekostil was sanctioned by the U.S. in September 2023 after it became "one of the largest importers of dual-use chips into Russia", per the U.S. Treasury.

**False and Misleading Statements**

***February 2, 2021 Press Release and February 5, 2021 Form 10-Q***

101.    On February 2, 2021, the Company published a press release announcing its financial results for the quarterly period ended December 31, 2020 ("2Q21") ("2Q21 Release"). Days later, on February 5, 2021, the Company filed its quarterly report on Form 10-Q with the SEC  for 2Q21 (the "2Q21 10-Q"), which was signed by Defendants Liang and Weigand and contained Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Liang and Weigand attesting that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with

generally accepted accounting principles."

102.   The 2Q21 Release and 2Q21 10-Q reported the Company's financial results for 2Q21 as follows:

• Net sales of $830 million versus $762 million in the first quarter of fiscal year 2021
and $871 million in the same quarter of last year.
• Gross margin of 16.4% versus 17.0% in the first quarter of fiscal year 2021 and 15.9%
in the same quarter of last year.
• Net income of $28 million versus $27 million in the first quarter of fiscal year 2021
and $24 million in the same quarter of last year.
• Diluted net income per common share of $0.52 versus $0.49 in the first quarter of
fiscal year 2021 and $0.46 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $0.63 versus $0.55 in the first
quarter of fiscal year 2021 and $0.57 in the same quarter of last year.
• Cash flow from operations of $63 million and capital expenditures of $14 million.

103.   In addition, the 2Q21 10-Q represented that the Company had "undertaken remedial procedures to address the IT General Control (ITGC) material weakness in our internal control over financial reporting," that "management continued to re-design processes and controls related to IT privileged access for our primary accounting system and boundary systems," and that "[m]anagement's testing of ITGCs has commenced and the remediation of this material weakness will depend on management's ability to ensure properly designed ITGC's are operating effectively as of June 30, 2021."

***May 4, 2021 Press Release and May 7, 2021 Form 10-Q***

104.   On May 4, 2021, the Company published a press release announcing its financial results for the quarterly period ended March 31, 2021 ("3Q21") ("3Q21 Release"). Days later, on May 7, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for 3Q21 (the "3Q21 10-Q"), which was signed by Defendants Liang and

Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

105.    The 3Q21 Release and 3Q21 10-Q reported the Company's financial results for 3Q21 as follows:

• Net sales of $896 million versus $830 million in the second quarter of fiscal year 2021
and $772 million in the same quarter of last year.
• Gross margin of 13.7% versus 16.4% in the second quarter of fiscal year 2021 and
17.3% in the same quarter of last year.
• Net income of $18 million versus $28 million in the second quarter of fiscal year 2021
and $16 million in the same quarter of last year.
• Diluted net income per common share of $0.35 versus $0.52 in the second quarter of
fiscal year 2021 and $0.29 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $0.50 versus $0.63 in the second
quarter of fiscal year 2021 and $0.84 in the same quarter of last year.
• Cash flow used in operations of $124 million and capital expenditures of $19 million.

106.    In addition, the 3Q21 10-Q represented that the Company had "undertaken remedial procedures to address the IT General Control (ITGC) material weakness in our internal control over financial reporting," that "management continued to re-design processes and controls related to IT privileged access for our primary accounting system and boundary systems," and that "[m]anagement's testing of ITGCs and the remediation

of this material weakness will depend on management's ability to ensure properly designed ITGC's are operating effectively as of June 30, 2021."

### *August 10, 2021 Press Release and August 27, 2021 Form 10-K*

107.    On August 10, 2021, the Company published a press release announcing its financial results for the fourth quarter and full 2021 Fiscal Year (the "4Q21 Release"). Days later, on August 27, 2021, the Company filed its annual report on Form 10-K with the SEC for the 2021 Fiscal Year (the "2021 10-K"), which was signed by Defendants Liang, Weigand, S. Liu, Fairfax, Tseng, Tuan, Chan, and T. Liu. The 2021 10-K also contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 2021 10-K, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." In relevant part, the 4Q21 Release stated the following:

> Net sales for the fiscal year ended June 30, 2021, were $3.56 billion versus $3.34 billion for the fiscal year ended June 30, 2020. Net income for fiscal year 2021 was $112 million, or $2.09 per diluted share, versus $84 million, or $1.60 per diluted share, for fiscal year 2020. Non-GAAP net income for the fiscal year 2021 was $136 million, or $2.48 per diluted share, versus $150 million, or $2.77 per diluted share, for fiscal year 2020. Non-GAAP net income for the fiscal year 2021 adds back stock-based compensation expense of $28.5 million, special performance bonuses of $5.8 million, executive SEC settlement credit of $2.1 million, and controls remediation costs and other expenses of $1.3 million, less tax effects of $9.0 million.

108.    In addition, the 4Q21 Release and 2021 10-K reported the Company's financial results for the fourth quarter and full 2021 Fiscal Year as follows:

> • Net sales of $1.07 billion versus $896 million in the third quarter of fiscal year 2021 and $896 million in the same quarter of last year.

1   • Gross margin of 13.6% versus 13.7% in the third quarter of fiscal year 2021
2   and 13.8% in the same quarter of last year.
    • Net income of $39 million versus $18 million in the third quarter of fiscal
3   year 2021 and $18 million in the same quarter of last year.
4   • Diluted net income per common share of $0.74 versus $0.35 in the third
    quarter of fiscal year 2021 and $0.34 in the same quarter of last year.
5   • Non-GAAP diluted net income per common share of $0.81 versus $0.50 in
6   the third quarter of fiscal year 2021 and $0.68 in the same quarter of last year.
    • Cash flow generated from operations of $64 million and capital expenditures
7   of $13 million.

8       109.   The 4Q21 Release also included projections for an outlook for Super Micro's

9   2022 Fiscal Year, stating the following, in relevant part:

10      The Company expects net sales of $4.1 billion to $4.5 billion, GAAP net
        income per diluted share of at least $2.60 and non-GAAP net income per
11      diluted share of at least $3.00 for fiscal year 2022 ending June 30, 2022. The
12      Company's projections for GAAP and non-GAAP net income per diluted
        share both assume a tax rate of approximately 16% and a fully diluted share
13      count of 55.3 million shares for GAAP and fully diluted share count of 56.5
14      million shares for non-GAAP. The outlook for fiscal year 2022 GAAP net
        income per diluted share includes approximately $30 million in expected
15      stock-based compensation expense and other expenses that are excluded from
16      non-GAAP net income per diluted share.

17      110.   In addition, the 2021 10-K represented that "management has concluded that

18  our internal control over financial reporting was effective as of June 30, 2021 to provide

19  reasonable assurance regarding the reliability of financial reporting and preparation of

20  consolidated financial statements in accordance with U.S. GAAP."

21      111.   The 2021 10-K also stated the following, in relevant part, regarding the

22  Company's related party transactions:

23      We use Ablecom, a related party, for contract design and manufacturing
        coordination support and warehousing, and Compuware, also a related party
24      and an affiliate of Ablecom, for distribution, contract manufacturing and
25      warehousing. We work with Ablecom to optimize modular designs for our
        chassis and certain of other components. We outsource to Compuware a
26      portion of our design activities and a significant part of our manufacturing of
27      subassemblies, particularly power supplies. Our purchases of products from
28      Ablecom and Compuware represented 7.8%, 10.1% and 9.2% of our cost of

sales for fiscal years 2021, 2020 and 2019, respectively. Ablecom and Compuware's sales to us constitute a substantial majority of Ablecom and Compuware's net sales. Ablecom and Compuware are both privately-held Taiwan-based companies. In addition, we have entered into a distribution agreement with Compuware, under which we have appointed Compuware as a nonexclusive distributor of our products in Taiwan, China and Australia.

Steve Liang, Ablecom's Chief Executive Officer and largest shareholder, is the brother of Charles Liang, our President, Chief Executive Officer and Chairman of our Board of Directors ("the Board"). Steve Liang owned no shares of our common stock as of June 30, 2021, 2020 or 2019. Charles Liang and his spouse, Sara Liu, our Co-Founder, Senior Vice President and Director, jointly owned approximately 10.5% of Ablecom's capital stock, while Mr. Steve Liang and other family members owned approximately 28.8% of Ablecom's outstanding common stock as of June 30, 2021. Bill Liang, a brother of both Charles Liang and Steve Liang, is a member of the Board of Directors of Ablecom as well.

In October 2018, our Chief Executive Officer, Charles Liang, personally borrowed approximately $12.9 million from Chien-Tsun Chang, the spouse of Steve Liang. The loan is unsecured, has no maturity date and bore interest at 0.8% per month for the first six months, increased to 0.85% per month through February 28, 2020, and reduced to 0.25% effective March 1, 2020. The loan was originally made at Mr. Liang's request to provide funds to repay margin loans to two financial institutions, which loans had been secured by shares of our common stock that he held. The lenders called the loans in October 2018, following the suspension of our common stock from trading on NASDAQ in August 2018 and the decline in the market price of our common stock in October 2018. As of June 30, 2021, the amount due on the unsecured loan (including principal and accrued interest) was approximately $15.3 million.

Bill Liang is also the Chief Executive Officer of Compuware, a member of Compuware's Board of Directors and a holder of a significant equity interest in Compuware. Steve Liang is also a member of Compuware's Board of Directors and is an equity holder of Compuware.
. . .
The Company has entered into a series of agreements with Ablecom, including multiple product development, production and service agreements, product manufacturing agreements, manufacturing services agreements and lease agreements for warehouse space.

Under these agreements, the Company outsources to Ablecom a portion of its design activities and a significant part of its server chassis manufacturing as well as an immaterial portion of other components. ***Ablecom manufactured approximately 91.8%, 95.5% and 96.3% of the chassis included in the products sold by the Company during fiscal years 2021, 2020 and 2019, respectively***. With respect to design activities, Ablecom generally agrees to design certain agreed upon products according to the Company's specifications, and further agrees to build the tools needed to manufacture the products. The Company pays Ablecom for the design and engineering services, and further agrees to pay Ablecom for the tooling. The Company retains full ownership of any intellectual property resulting from the design of these products and tooling.

With respect to the manufacturing aspects of the relationship, Ablecom purchases most of materials needed to manufacture the chassis from third parties and ***the Company provides certain components used in the manufacturing process (such as power supplies) to Ablecom through consignment or sales transactions. Ablecom uses these materials and components to manufacture the completed chassis and then sell them back to the Company***. For the components purchased from the Company, Ablecom sells the components back to the Company at a price equal to the price at which the Company sold the components to Ablecom. The Company and Ablecom frequently review and negotiate the prices of the chassis the Company purchases from Ablecom. In addition to inventory purchases, the Company also incurs other costs associated with design services, tooling and other miscellaneous costs from Ablecom.

. . .

The Company has entered into a distribution agreement with Compuware, under which the Company appointed Compuware as a non-exclusive distributor of the Company's products in Taiwan, China and Australia. Compuware assumes the responsibility to install the Company's products at the site of the end customer, if required, and administers customer support in exchange for a discount from the Company's standard price for its purchases.

The Company also has entered into a series of agreements with Compuware, including a multiple product development, production and service agreements, product manufacturing agreements, and lease agreements for office space.

Under these agreements, the Company outsources to Compuware a portion of its design activities and a significant part of its power supplies manufacturing

as well as an immaterial portion of other components. With respect to design activities, Compuware generally agrees to design certain agreed-upon products according to the Company's specifications, and further agrees to build the tools needed to manufacture the products. The Company pays Compuware for the design and engineering services, and further agrees to pay Compuware for the tooling. The Company retains full ownership of any intellectual property resulting from the design of these products and tooling. With respect to the manufacturing aspects of the relationship, Compuware purchases most of materials needed to manufacture the power supplies from outside markets and uses these materials to manufacture the products and then sell those products to the Company. The Company and Compuware frequently review and negotiate the prices of the power supplies the Company purchases from Compuware.

Compuware also manufactures motherboards, backplanes and other components used on printed circuit boards for the Company. ***The Company sells to Compuware most of the components needed to manufacture the above products. Compuware uses the components to manufacture the products and then sells the products back to the Company at a purchase price equal to the price at which the Company sold the components to Compuware, plus a "manufacturing value added" fee and other miscellaneous material charges and costs.*** The Company and Compuware frequently review and negotiate the amount of the "manufacturing value added" fee that will be included in the price of the products the Company purchases from Compuware. In addition to the inventory purchases, the Company also incurs costs associated with design services, tooling assets, and miscellaneous costs.

. . .

The Company's net sales to Ablecom were not material for the fiscal years ended June 30, 2021, 2020 and 2019.

. . .

***Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. For fiscal years ended June 30, 2021, 2020 and 2019, we purchased products from Ablecom totaling $122.2 million, $152.5 million and $137.9 million, respectively***. Amounts owed to Ablecom by us as of June 30, 2021 and 2020, were $41.2 million and $40.1 million, respectively. For the fiscal years ended June 30, 2021, 2020 and 2019, we paid Ablecom $8.6 million, $7.6 million and $7.4 million, respectively, for design services, tooling assets and miscellaneous costs.

*Compuware's sales of our products to others comprise a majority of Compuware's net sales. For fiscal years ended June 30, 2021, 2020 and 2019, we sold products to Compuware totaling $27.9 million, $23.9 million and $17.7 million, respectively*. Amounts owed to us by Compuware as of June 30, 2021 and 2020, were $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. *For the fiscal years ended June 30, 2021, 2020 and 2019, we purchased products from Compuware totaling $113.4 million, $130.6 million and $138.9 million, respectively*. Amounts we owed to Compuware as of June 30, 2021 and 2020, were $46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2021, 2020 and 2019, we paid Compuware $1.8 million, $1.2 million and $0.7 million, respectively, for design services, tooling assets and miscellaneous costs.

### November 2, 2021 Press Release and November 5, 2021 Form 10-Q

112.    On November 2, 2021, the Company published a press release announcing its financial results for the quarterly period ended September 30, 2021 ("1Q22") (the "1Q22 Release"). Days later, on November 5, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for 1Q22 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 1Q22 10-Q, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

113.    The 1Q22 Release and 1Q22 10-Q reported the Company's financial results for 1Q22 as follows:

• Net sales of $1.03 billion versus $1.07 billion in the fourth quarter of fiscal year 2021 and $762 million in the same quarter of last year.
• Gross margin of 13.4% versus 13.6% in the fourth quarter of fiscal year 2021 and 17.0% in the same quarter of last year.
• Net income of $25 million versus $39 million in the fourth quarter of fiscal year 2021 and $27 million in the same quarter of last year.
• Diluted net income per common share of $0.48 versus $0.74 in the fourth quarter of fiscal year 2021 and $0.49 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $0.58 versus $0.81 in the fourth quarter of fiscal year 2021 and $0.55 in the same quarter of last year.
• Cash flow used in operations of $135 million and capital expenditures of $12 million.

114.   In addition, the 1Q22 10-Q represented that "[t]here were no changes in our internal control over financial reporting during the quarter ended September 30, 2021, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

### *February 1, 2022 Press Release and February 4, 2022 Form 10-Q*

115.   On February 1, 2022, the Company published a press release announcing its financial results for the quarterly period ended December 31, 2021 ("2Q22") (the "2Q22 Release"). Days later, on February 4, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for 2Q22 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 2Q22 10-Q, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

116.   The 2Q22 Release and 2Q22 10-Q reported the Company's financial results for 2Q22 as follows:

- Net sales of $1.17 billion versus $1.03 billion in the first quarter of fiscal year 2022 and $830 million in the same quarter of last year.
- Gross margin of 14.0% versus 13.4% in the first quarter of fiscal year 2022 and 16.4% in the same quarter of last year.
- Net income of $42 million versus $25 million in the first quarter of fiscal year 2022 and $28 million in the same quarter of last year.
- Diluted net income per common share of $0.78 versus $0.48 in the first quarter of fiscal year 2022 and $0.52 in the same quarter of last year.
- Non-GAAP diluted net income per common share of $0.88 versus $0.58 in the first quarter of fiscal year 2022 and $0.63 in the same quarter of last year.
- Cash flow used in operations for the second quarter of fiscal year 2022 of $53 million and capital expenditures of $12 million.

117.   In addition, the 2Q22 10-Q represented that "[t]here were no changes in our internal control over financial reporting during the quarter ended December 31, 2021, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

118.   The statements in ¶¶101-117 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's reported revenues, earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about related parties and related party transactions from investors. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***2022 Proxy Statement***

119.   On April 13, 2022, Super Micro filed a Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Fairfax, Tseng, and Chan solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

120. The 2022 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Chan and Fairfax to the Board; (2) ratify the appointment of Deloitte & Touche LLP ("Deloitte") as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve the amendment and restatement of the Super Micro Computer, Inc. 2020 Equity and Incentive Compensation Plan (the "Plan") to increase the number of shares available for issuance thereunder by 2,000,000 shares.

121. Regarding "Board Role in the Oversight of Risk," the 2022 Proxy Statement stated the following:

> The Board oversees our risk management activities, requesting and receiving reports from management. The Board conducts this oversight directly and through its committees. The Board has delegated primary responsibility for oversight of risks relating to financial controls and reporting to our Audit Committee. The Audit Committee also assists the Board in oversight of certain other risks, including internal controls and review of related party transactions. The Audit Committee reports to the full Board on such matters as appropriate.
>
> Our management, with oversight from our Compensation Committee, has reviewed our compensation policies and practices with respect to risk-taking incentives and risk management and does not believe that potential risks arising from our compensation polices or practices are reasonably likely to have a material adverse effect on our company.

122. Regarding the Code of Conduct, the 2022 Proxy Statement stated the following:

> We have adopted a "Code of Business Conduct and Ethics" that is applicable to all directors, executive officers and employees and embodies our principles and practices relating to the ethical conduct of our business and our long-standing commitment to honesty, fair dealing and full compliance with all laws affecting our business. Our "Code of Business Conduct and Ethics" is available                at https://ir.supermicro.com/governance/governance-documents/default.aspx. Any substantive amendment or waiver of the Code relating to executive officers or directors will be made only after approval by our Board and will be promptly disclosed on our website within four business days.

123.   With respect to the proposal to amend the Plan, the 2022 Proxy Statement stated the following, in relevant part:

On March 26, 2022, upon recommendation by the Compensation Committee, the Board of Directors approved and adopted, subject to the approval of the Company's stockholders at the Annual Meeting, an amendment and restatement of the original Super Micro Computer, Inc. 2020 Equity and Incentive Compensation Plan (referred to as the 2020 Plan) in the form of the Amended 2020 Plan attached to this proxy statement.

Stockholders previously approved the 2020 Plan, which affords the Compensation Committee the ability to design compensatory awards that are responsive to the Company's needs and authorizes a variety of award types designed to advance the interests and long-term success of the Company by encouraging stock ownership among non-employee directors of the Company and employees (including officers) and certain consultants or other service providers of the Company and its subsidiaries. You are being asked to approve the Amended 2020 Plan.

Stockholder approval of the Amended 2020 Plan would make available for awards under the Amended 2020 Plan an additional 2,000,000 shares of Common Stock, par value of $0.001 per share, of the Company ("Common Stock"), as described below and in the Amended 2020 Plan, with such amount subject to adjustment, including under the Amended 2020 Plan's share counting rules.

***

Our Board and our management team believe that stockholder approval of the Amended 2020 Plan is critical to our future success. ***Without the additional shares of Common Stock available for award under the Amended 2020 Plan, we believe the current shares available for award under the 2020 Plan will be fully utilized by the end of the third quarter of fiscal year 2023, which is approximately 2.7 years following stockholder approval of the 2020 Plan on June 5, 2020.*** When stockholders previously approved the 2020 Plan, we had anticipated that the shares requested in connection therewith would last for about two to three years.

124.   Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Fairfax, Tseng, and Chan caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's

reported revenues, earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about related parties and related party transactions from investors. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

125.    The 2022 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

126.    As a result of Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Fairfax, Tseng, and Chan causing the 2022 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Chan and Fairfax to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve the amendment and restatement of the Plan to increase the number of shares available for issuance thereunder by 2,000,000 shares.

### *May 3, 2022 Press Release and May 6, 2022 Form 10-Q*

127.    On May 3, 2022, the Company published a press release announcing its financial results for the quarterly period ended March 31, 2022 ("3Q22") (the "3Q22 Release"). Days later, on May 6, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for 3Q22 (the "3Q22 10-Q"). The 3Q22 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 3Q22 10-Q, that "the financial statements,

and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

128.    The 3Q22 Release and 3Q22 10-Q reported the Company's financial results for 3Q22 as follows:

• Net sales of $1.36 billion versus $1.17 billion in the second quarter of fiscal year 2022 and $896 million in the same quarter of last year.
• Gross margin of 15.5% versus 14.0% in the second quarter of fiscal year 2022 and 13.7% in the same quarter of last year.
• Net income of $77 million versus $42 million in the second quarter of fiscal year 2022 and $18 million in the same quarter of last year.
• Diluted net income per common share of $1.43 versus $0.78 in the second quarter of fiscal year 2022 and $0.35 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $1.55 versus $0.88 in the second quarter of fiscal year 2022 and $0.50 in the same quarter of last year.
• Cash flow used in operations for the third quarter of fiscal year 2022 of $228 million and capital expenditures of $11 million.

129.    In addition, the 3Q22 10-Q represented that "[t]here were no changes in our internal control over financial reporting during the quarter ended March 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

130.    With respect to its sales to Russia, the Company represented the following in the 3Q22 10-Q:

The crisis in eastern Europe continues to be a challenge to global companies, including us, which have customers in the impacted regions. The U.S. and other global governments have placed restrictions on how companies may transact with businesses in these regions, particularly Russia, Belarus and restricted areas in Ukraine. ***Because of these restrictions and the growing***

*logistical and other challenges, we have paused sales to Russia, Belarus and the restricted areas in Ukraine. This decision, which is in line with the approach of other global technology companies, helps us comply with our obligations under the various requirements in the U.S. and around the world*. While it is difficult to estimate the impact on our business and financial position of our pause in sales to Russia, Belarus and the restricted areas in Ukraine and the current or future sanctions, our pause in sales and these sanctions could have adverse impacts on us in future periods. For example, *we do not make a material portion of our sales or acquire a material portion of our parts or components directly from impacted regions; however, our suppliers and their suppliers may acquire raw materials for parts or components from the impacted regions*.

***

No assurances can be given that additional developments in the impacted regions, and responses thereto from the U.S. and other global governments, would not have a material adverse effect on our business, results of operations and financial condition.

### August 9, 2022 Press Release and August 29, 2022 Form 10-K

131.  On August 9, 2022, the Company published a press release announcing its financial results for the fourth quarter and full 2022 Fiscal Year (the "4Q22 Release"). Later, on August 29, 2022, the Company filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"), which was signed by Defendants Liang, Weigand, S. Liu, Fairfax, Lin, Tuan, Chan, and T. Liu. The 2022 10-K also contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 2022 10-K, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

132.   The 4Q22 Release quoted Defendant Liang as saying the following, in relevant part:

> The Supermicro team has attained yet another milestone by achieving $5.2 billion in annual revenue . . . The ramp up of recent design wins and top tier customers adopting our plug and play ("PNP") rack-scale solutions have given us momentum going into fiscal year 2023. We are well on our way to becoming the leading global supplier of rack-scale Total IT Solutions, powering the world's digital transformation across diverse applications in key market segments including AI, enterprise, cloud, edge/telco and others.

133.   The Company also provided the following summary of its financial results:

> Net sales for the fiscal year ended June 30, 2022, were $5.20 billion versus $3.56 billion for the fiscal year ended June 30, 2021. Net income for fiscal year 2022 was $285 million, or $5.32 per diluted share, versus $112 million, or $2.09 per diluted share, for fiscal year 2021. Non-GAAP net income for the fiscal year 2022 was $311 million, or $5.65 per diluted share, versus $136 million, or $2.48 per diluted share, for fiscal year 2021. Non-GAAP net income for the fiscal year 2022 adds back stock-based compensation expense of $32.8 million, litigation expenses of $4.4 million, $2.0 million of litigation settlement costs, and $0.5 million of special performance bonuses, net of the related tax effects.

134.   In addition, with respect to the Company's outlook for the 2023 Fiscal Year, the 4Q22 Release stated:

> For fiscal year 2023 ending June 30, 2023, the Company expects net sales of $6.2 billion to $7.0 billion, GAAP net income per diluted share of at least $7.27 and non-GAAP net income per diluted share of at least $7.50. The Company's projections for GAAP and non-GAAP net income per diluted share assume a tax rate of approximately 20.3% and 21.1%, respectively, and a fully diluted share count of 55.6 million shares for GAAP and fully diluted share count of 57.0 million shares for non-GAAP. The outlook for fiscal year 2023 GAAP net income per diluted share includes approximately $35.4 million in expected stock-based compensation expense and other expenses, net of related tax effects that are excluded from non-GAAP net income per diluted share.

135.   The 4Q22 Release and 2022 10-K reported the Company's financial results for the fourth quarter and full 2022 Fiscal Year as follows:

• Net sales of $1.64 billion versus $1.36 billion in the third quarter of fiscal year 2022 and $1.07 billion in the same quarter of last year.
• Gross margin of 17.6% versus 15.5% in the third quarter of fiscal year 2022 and 13.6% in the same quarter of last year.
• Net income of $141 million versus $77 million in the third quarter of fiscal year 2022 and $39 million in the same quarter of last year.
• Diluted net income per common share of $2.60 versus $1.43 in the third quarter of fiscal year 2022 and $0.74 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $2.62 versus $1.55 in the third quarter of fiscal year 2022 and $0.81 in the same quarter of last year.
• Cash flow used in operations for the fourth quarter of fiscal year 2022 of $25 million and capital expenditures of $11 million.

136.    In addition, the 2022 10-K represented that "[t]here were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the three months ended June 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting" and that "[u]nder the supervision, and with the participation, of our management, including our Chief Executive Officer ('CEO') and Chief Financial Officer ('CFO'), we evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the 'Exchange Act'), as of June 30, 2022. Based on this evaluation, our CEO and CFO have concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of June 30, 2022."

137.    With respect to the Company's related party transactions, the 2022 10-K stated the following, in relevant part:

Ablecom manufactured approximately 88.2%, 91.8% and 95.5% of the chassis included in the products sold by the Company during fiscal years 2022, 2021 and 2020, respectively.

. . .

Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. *For fiscal years ended June 30, 2022*, 2021 and 2020, *we purchased products from Ablecom totaling $192.4 million*, $122.2 million and $152.5 million, respectively. Amounts owed to Ablecom by us as of June 30, 2022, 2021 and 2020, were $46.0 million, $41.2 million and $40.1 million, respectively. *For*

*the fiscal years ended June 30, 2022*, 2021 and 2020, *we paid Ablecom $8.3 million,* $8.6 million and $7.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. *For fiscal years ended June 30, 2022*, 2021 and 2020, *we sold products to Compuware totaling $26.1 million*, $27.9 million and $23.9 million, respectively. Amounts owed to us by Compuware as of June 30, 2022, 2021 and 2020, were $20.0 million, $18.4 million and $14.3 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. *For the fiscal years ended June 30, 2022*, 2021 and 2020, *we purchased products from Compuware totaling $170.3 million*, $113.4 million and $130.6 million, respectively. Amounts we owed to Compuware as of June 30, 2022, 2021 and 2020 were $60.0 million, $46.4 million and $46.5 million, respectively. For the fiscal years ended June 30, 2022, 2021 and 2020, we paid Compuware $1.5 million, $1.8 million and $1.2 million, respectively, for design services, tooling assets and miscellaneous costs.

138.  With respect to its sales to Russia, the Company represented the following in the 2022 10-K:

The crisis in eastern Europe continues to be a challenge to global companies, including us, which have customers in the impacted regions. The U.S. and other global governments have placed restrictions on how companies may transact with businesses in these regions, particularly Russia, Belarus and restricted areas in Ukraine. *Because of these restrictions and the growing logistical and other challenges, we have paused sales to Russia, Belarus and the restricted areas in Ukraine. This decision, which is in line with the approach of other global technology companies, helps us comply with our obligations under the various requirements in the U.S. and around the world*. While it is difficult to estimate the impact on our business and financial position of our pause in sales to Russia, Belarus and the restricted areas in Ukraine and the current or future sanctions, our pause in sales and these sanctions could have adverse impacts on us in future periods. For example, *we do not make a material portion of our sales or acquire a material portion of our parts or components directly from impacted regions; however, our*

*suppliers and their suppliers may acquire raw materials for parts or components from the impacted regions*.

**November 1, 2022 Press Release and November 4, 2022 Form 10-Q**

139.    On November 1, 2022, the Company published a press release announcing its financial results for the quarterly period ended September 30, 2022 ("1Q23") (the "1Q23 Release"). Days later, on November 4, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for 1Q23 (the "1Q23 10-Q"). The 1Q23 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 1Q23 10-Q, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

140.    The 1Q23 Release and 1Q23 10-Q reported the Company's financial results for 1Q23 as follows:

• Net sales of $1.85 billion versus $1.64 billion in the fourth quarter of fiscal year 2022 and $1.03 billion in the same quarter of last year.
• Gross margin of 18.8% versus 17.6% in the fourth quarter of fiscal year 2022 and 13.4% in the same quarter of last year.
• Net income of $184 million versus $141 million in the fourth quarter of fiscal year 2022 and $25 million in the same quarter of last year.
• Diluted net income per common share of $3.35 versus $2.60 in the fourth quarter of fiscal year 2022 and $0.48 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $3.42 versus $2.62 in the fourth quarter of fiscal year 2022 and $0.58 in the same quarter of last year.
• Cash flow provided by operations for the first quarter of fiscal year 2023 of $314 million and capital expenditures of $11 million.

141.    In addition, the 1Q23 10-Q represented that "[t]here were no changes in our

internal control over financial reporting during the quarter ended September 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

### *January 31, 2023 Press Release and February 3, 2023 Form 10-Q*

142. On January 31, 2023, the Company published a press release announcing its financial results for the quarterly period ended December 31, 2022 ("2Q23") (the "2Q23 Release"). Days later, on February 3, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for 2Q23 (the "2Q23 10-Q"). The 2Q23 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 2Q23 10-Q, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

143. The 2Q23 Release and 2Q23 10-Q reported the Company's financial results for 2Q23 as follows:

• Net sales of $1.80 billion versus $1.85 billion in the first quarter of fiscal year 2023 and $1.17 billion in the same quarter of last year.
• Gross margin of 18.7% versus 18.8% in the first quarter of fiscal year 2023 and 14.0% in the same quarter of last year.
• Net income of $176 million versus $184 million in the first quarter of fiscal year 2023 and $42 million in the same quarter of last year.
• Diluted net income per common share of $3.14 versus $3.35 in the first quarter of fiscal year 2023 and $0.78 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $3.26 versus $3.42 in the first quarter of fiscal year 2023 and $0.88 in the same quarter of last year.
• Cash flow provided by operations for the second quarter of fiscal year 2023 of $161 million and capital expenditures of $10 million.

144.   In addition, the 2Q23 10-Q represented that "[t]here were no changes in our internal control over financial reporting during the quarter ended December 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

145.   The statements in ¶¶127-144 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's reported revenues, earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about related parties and related party transactions from investors. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 2023 Proxy Statement*

146.   On April 14, 2023, Super Micro filed a Schedule 14A with the SEC (the "April 2023 Proxy Statement"). Defendants Liang, Tuan, T. Liu, Blair, Lin, S. Liu, Fairfax, and Chan solicited the April 2023 Proxy Statement, which contained material misstatements and omissions.

147.   The April 2023 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Liang, Tuan, and T. Liu to the Board; (2) ratify the appointment of Deloitte as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of Super Micro's named executive officers.

148.   Regarding "Board Role in the Oversight of Risk," the April 2023 Proxy Statement stated the following:

> The Board oversees our risk management activities, requesting and receiving reports from management. The Board conducts this oversight directly and through its committees. The Board has delegated primary responsibility for oversight of risks relating to financial controls and reporting to our Audit Committee. The Audit Committee also assists the Board in oversight of

certain other risks, including internal controls and review of related party
transactions. The Audit Committee reports to the full Board on such matters
as appropriate.

Our management, with oversight from our Compensation Committee, has
reviewed our compensation policies and practices with respect to risk-taking
incentives and risk management and does not believe that potential risks
arising from our compensation polices or practices are reasonably likely to
have a material adverse effect on our company.

149.    Regarding the Code of Conduct, the April 2023 Proxy Statement stated the
following:

We have adopted a "Code of Business Conduct and Ethics" that is applicable
to all directors, executive officers and employees and embodies our principles
and practices relating to the ethical conduct of our business and our long-
standing commitment to honesty, fair dealing and full compliance with all
laws affecting our business. Our "Code of Business Conduct and Ethics" is
available                    at https://ir.supermicro.com/governance/governance-
documents/default.aspx. Any substantive amendment or waiver of the Code
relating to executive officers or directors will be made only after approval by
our Board of Directors and will be promptly disclosed on our website within
four business days.

150.    Defendants Liang, Tuan, T. Liu, Blair, Lin, S. Liu, Fairfax, and Chan caused
the April 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*,
that: (1) Defendants were participating in the Export Control Misconduct; (2) the
Company's reported revenues, earnings, and other financial figures were materially
misstated in violation of GAAP; (3) the Company had ineffective internal controls over
financial reporting; and (4) Defendants concealed material information about related
parties and related party transactions from investors. As a result of the foregoing, the
Company's public statements were materially false and misleading and/or lacked a
reasonable basis at all relevant times.

151.    The April 2023 Proxy Statement also was false and misleading because it
failed to disclose that: (1) though the Company claimed its officers and directors adhered
to the Code of Conduct, the Individual Defendants violated these policies either without

waivers or without such waivers being disclosed; and (2) contrary to the April 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

152.    As a result of Defendants Liang, Tuan, T. Liu, Blair, Lin, S. Liu, Fairfax, and Chan causing the April 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Liang, Tuan, and T. Liu to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of Super Micro's named executive officers.

### *May 2, 2023 Press Release and May 5, 2023 Form 10-Q*

153.    On May 2, 2023, the Company published a press release announcing its financial results for the quarterly period ended March 31, 2023 ("3Q23") (the "3Q23 Release"). Days later, on May 5, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for 3Q23 (the "3Q23 10-Q"). The 3Q23 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 3Q23 10-Q, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

154.    The 3Q23 Release and 3Q23 10-Q reported the Company's financial results for 3Q23 as follows:

• Net sales of $1.28 billion versus $1.80 billion in the second quarter of fiscal year 2023 and $1.36 billion in the same quarter of last year.

• Gross margin of 17.6% versus 18.7% in the second quarter of fiscal year 2023 and 15.5% in the same quarter of last year.

• Net income of $86 million versus $176 million in the second quarter of fiscal year 2023 and $77 million in the same quarter of last year.

• Diluted net income per common share of $1.53 versus $3.14 in the second quarter of fiscal year 2023 and $1.43 in the same quarter of last year.

• Non-GAAP diluted net income per common share of $1.63 versus $3.26 in the second quarter of fiscal year 2023 and $1.55 in the same quarter of last year.

• Cash flow provided by operations for the third quarter of fiscal year 2023 of $198 million and capital expenditures of $8 million.

155.   In addition, the 3Q23 10-Q represented that "[t]here were no changes in our internal control over financial reporting during the quarter ended March 31, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

156.   With respect to Super Micro's sales in Russia, the 3Q23 10-Q stated the following:

The Company had previously, before the designation of the FSB in Executive Order 13382, authorized certain third parties to periodically file notifications with, or apply for import licenses and permits from, the FSB on our behalf in connection with the importation of our products into Russia, as permitted under OFAC authorizations. During fiscal year 2023, including the most recent quarter ended March 31, 2023, third parties filed notifications with, applied for import licenses and permits from, and/or received the associated approvals from the FSB on our behalf. ***However, no sales of any products actually occurred in the Russian Federation during fiscal year 2023, including the most recent quarter ended March 31, 2023, and accordingly, these filing activities did not result in any revenue or otherwise contribute to the Company's net income for these quarters. The Company is in the process of terminating these authorizations. The Company and its subsidiaries do not sell products or provide services to the FSB. The Company and its subsidiaries had last recorded revenue from Russia on February 23, 2022***.

***August 8, 2023 Press Release and August 28, 2023 Form 10-K***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

157.   On August 8, 2023, the Company published a press release announcing its financial results for the fourth quarter and full 2023 Fiscal Year (the "4Q23 Release"). Days later, on August 28, 2023, the Company filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"), which was signed by Defendants Liang, Weigand, S. Liu, Fairfax, Lin, Blair, Tuan, Chan, and T. Liu. The 2023 10-K also contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 2023 10-K, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

158.   The 4Q23 Release contained the following summary of the Company's financial results:

> Net sales for the fiscal year ended June 30, 2023, were $7.12 billion versus $5.20 billion for the fiscal year ended June 30, 2022. Net income for fiscal year 2023 was $640 million, or $11.43 per diluted share, versus $285 million, or $5.32 per diluted share, for fiscal year 2022. Non-GAAP net income for fiscal year 2023 was $673 million, or $11.81 per diluted share, versus $311 million, or $5.65 per diluted share, for fiscal year 2022. Non-GAAP net income for fiscal year 2023 adds back stock-based compensation expense of $54 million and litigation recovery of $4 million, net of the related tax effects of $17 million.

159.   With respect to these results, Defendant Liang stated the following, in relevant part:

> Supermicro's record revenue and 37% year-over-year growth for fiscal year 2023 validates our global leadership position in AI accelerated compute platforms . . . We continue to see unprecedented demand for AI and other advanced applications requiring optimized rack-scale solutions. We are in a

great position to continue our growth momentum given our record new design wins, customers, and backlog for our best-in-class rack-scale Total AI & IT Solutions.

160.    With respect to the Company's outlook for the 2024 Fiscal Year, the 4Q23 Release provided investors with substantially less detail for its estimate than in prior years, providing, in pertinent part, only that "[f]or fiscal year 2024 ending June 30, 2024, the Company expects net sales of $9.5 billion to $10.5 billion."

161.    The 4Q23 Release and 2023 10-K also reported the Company's financial results for the fourth quarter and full 2023 Fiscal Year as follows:

• Net sales of $2.18 billion versus $1.28 billion in the third quarter of fiscal year 2023 and $1.64 billion in the same quarter of last year.
• Gross margin of 17.0% versus 17.6% in the third quarter of fiscal year 2023 and 17.6% in the same quarter of last year.
• Net income of $194 million versus $86 million in the third quarter of fiscal year 2023 and $141 million in the same quarter of last year.
• Diluted net income per common share of $3.43 versus $1.53 in the third quarter of fiscal year 2023 and $2.60 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $3.51 versus $1.63 in the third quarter of fiscal year 2023 and $2.62 in the same quarter of last year.
• Cash flow used in operations for the fourth quarter of fiscal year 2023 of $9 million and capital expenditures of $8 million.

162.    With respect to the Company's sales in Russia, the 2023 10-K stated the following:

On March 2, 2021, pursuant to Executive Order 13382, the Russian Federal Security Service (the "FSB") was designated by the U.S. government as a blocked party. Notwithstanding such designation, OFAC has issued General License No. 1B, authorizing certain transactions involving the FSB, including all transactions ordinarily incident and necessary to requesting, receiving, utilizing, paying for, or dealing in licenses, permits, certifications, or notifications issued or registered by the FSB for the importation, distribution, or use of information technology products in the Russian Federation, subject to certain limitations. Section 13(r) of the Exchange Act requires disclosure of dealings with FSB, even where the activities were conducted in compliance with applicable laws and regulations, and where such activities, transactions, or dealings did not have a material financial or other impact on the issuer.

As previously disclosed in our Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2023, we had previously, before the designation of the FSB in Executive Order 13382, authorized certain third parties to periodically file notifications with, or apply for import licenses and permits from, the FSB on our behalf in connection with the importation of our products into Russia, as permitted under OFAC authorizations. During various periods during fiscal year 2023, third parties filed notifications with, applied for import licenses and permits from, and/or received the associated approvals from the FSB on our behalf. ***However, no sales of any products actually occurred in the Russian Federation during fiscal year 2023, and accordingly, these filing activities did not result in any revenue or otherwise contribute to our net income during fiscal year 2023. We believe we have terminated all these authorizations. The Company and its subsidiaries do not sell products or provide services to the FSB. The Company and its subsidiaries had last recorded revenue from Russia on February 23, 2022.***

163.   The 2023 10-K also represented the following, in relevant part:

The crisis in eastern Europe continues to pose challenges to global companies, including us, which have customers in the impacted regions. The U.S. and other global governments have placed restrictions on how companies may transact with businesses in these regions, particularly Russia, Belarus and restricted areas in Ukraine. ***Because of these restrictions and the growing logistical and other challenges, we have paused sales to Russia, Belarus and the restricted areas in Ukraine. This decision, which is in line with the approach of other global technology companies, helps us comply with our obligations under the various requirements in the U.S. and around the world.*** While it is difficult to estimate the impact on our business and financial position of both (i) our pause in sales to Russia, Belarus and the restricted areas in Ukraine and the current or future sanctions and (ii) tensions in the Taiwan strait, our pause in sales and these sanctions and continuing rising tensions could have adverse impacts on us in future periods, although they have not been material to date. ***For example, with respect to Russia, Belarus and the restricted areas in Ukraine, we did not, prior to the imposition of restrictions, make a material portion of our sales or acquire a material portion of our parts or components directly from impacted regions; however, our suppliers and their suppliers may acquire raw materials for parts or components from the impacted regions.***

164.   In addition, the 2023 10-K represented that "[t]here were no changes in our internal control over financial reporting identified in connection with the evaluation

required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the three months ended June 30, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting" and that "[u]nder the supervision, and with the participation, of our management, including our Chief Executive Officer ('CEO') and Chief Financial Officer ('CFO'), we evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the 'Exchange Act'), as of June 30, 2023. Based on this evaluation, our CEO and CFO have concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of June 30, 2023."

165.  With respect to Super Micro's controls and procedures, the 2023 10-K also stated the following:

> Management, including our CEO and CFO, assessed our internal control over financial reporting as of June 30, 2023. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in its Internal Control - Integrated Framework (2013) (the "COSO Framework"). Based on this assessment, management has concluded that our internal control over financial reporting was effective as of June 30, 2023, to provide reasonable assurance regarding the reliability of financial reporting and preparation of consolidated financial statements in accordance with U.S. GAAP.

166.  The 2023 10-K also stated the following with respect to Super Micro's related party transactions:

> Ablecom manufactured approximately 91.9%, 88.2% and 91.8% of the chassis included in the products sold by the Company during fiscal years 2023, 2022 and 2021, respectively.
>
> . . .
>
> Ablecom's sales to us comprise a substantial majority of Ablecom's net sales. **_For fiscal years ended June 30, 2023_**, 2022 and 2021, **_we purchased products from Ablecom totaling $167.8 million_**, $192.4 million and $122.2 million, respectively. Amounts owed to Ablecom by us as of June 30, 2023, 2022 and 2021, were $36.9 million, $46.0 million and $41.2 million, respectively. For the fiscal years ended June 30, 2023, 2022 and 2021, we paid Ablecom $12.1 million, $8.3 million and $8.6 million, respectively, for design services, tooling assets and miscellaneous costs.

Compuware's sales of our products to others comprise a majority of Compuware's net sales. *For fiscal years ended June 30, 2023*, 2022 and 2021, *we sold products to Compuware totaling $36.3 million*, $26.1 million and $27.9 million, respectively. Amounts owed to us by Compuware as of June 30, 2023, 2022 and 2021, were $24.9 million, $19.6 million and $18.2 million, respectively. The price at which Compuware purchases the products from us is at a discount from our standard price for purchasers who purchase specified volumes from us. In exchange for this discount, Compuware assumes the responsibility to install our products at the site of the end customer and administers first-level customer support. *For the fiscal years ended June 30, 2023*, 2022 and 2021, *we purchased products from Compuware totaling $217.0 million*, $170.3 million and $113.4 million, respectively. Amounts we owed to Compuware as of June 30, 2023, 2022 and 2021 were $66.2 million, $60.0 million and $46.4 million, respectively. For the fiscal years ended June 30, 2023, 2022 and 2021, we paid Compuware $2.0 million, $1.5 million and $1.8 million, respectively, for design services, tooling assets and miscellaneous costs.

### *November 1, 2023 Press Release and November 3, 2023 Form 10-Q*

167.    On November 1, 2023, the Company published a press release announcing its financial results for the quarterly period ended September 30, 2023 ("1Q24") (the "1Q24 Release"). Days later, on November 3, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for 1Q24 (the "1Q24 10-Q"). The 1Q24 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 1Q24 10-Q, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

168.    The 1Q24 Release and 1Q24 10-Q reported the Company's financial results

for 1Q24 as follows:

    • Net sales of $2.12 billion versus $2.18 billion in the fourth quarter of fiscal year 2023 and $1.85 billion in the same quarter of last year.
    • Gross margin of 16.7% versus 17.0% in the fourth quarter of fiscal year 2023 and 18.8% in the same quarter of last year.
    • Net income of $157 million versus $194 million in the fourth quarter of fiscal year 2023 and $184 million in the same quarter of last year.
    • Diluted net income per common share of $2.75 versus $3.43 in the fourth quarter of fiscal year 2023 and $3.35 in the same quarter of last year.
    • Non-GAAP diluted net income per common share of $3.43 versus $3.51 in the fourth quarter of fiscal year 2023 and $3.42 in the same quarter of last year.
    • Cash flow provided by operations for the first quarter of fiscal year 2024 of $271 million and capital expenditures of $3 million.

169.   In addition, the 1Q24 10-Q represented that "[t]here were no changes in our internal control over financial reporting during the quarter ended September 30, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

170.   The statements in ¶¶153-169 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's reported revenues, earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about related parties and related party transactions from investors. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### December 8, 2023 Proxy Statement

171.   On December 8, 2023, Super Micro filed the December 2023 Proxy Statement with the SEC. Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Liaw, Fairfax, Blair, and Chan solicited the December 2023 Proxy Statement, which contained material misstatements and omissions.

172.    The December 2023 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Lin, S. Liu, and Liaw to the Board; (2) ratify the appointment of EY as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) to approve the further amendment and restatement of the Super Micro Computer, Inc. 2020 Equity and Incentive Compensation Plan (the "Plan").

173.    Regarding "Board Role in the Oversight of Risk," the December 2023 Proxy Statement stated the following:

> The Board oversees our risk management activities, requesting and receiving reports from management. The Board conducts this oversight directly and through its committees. The Board has delegated primary responsibility for oversight of risks relating to financial controls and reporting to our Audit Committee. The Audit Committee also assists the Board in oversight of certain other risks, including internal controls and review of related party transactions. The Audit Committee reports to the full Board on such matters as appropriate.

> Our management, with oversight from our Compensation Committee, has reviewed our compensation policies and practices with respect to risk-taking incentives and risk management and does not believe that potential risks arising from our compensation polices or practices are reasonably likely to have a material adverse effect on our company.

174.    Regarding the Code of Conduct, the December 2023 Proxy Statement stated the following:

> We have adopted a "Code of Business Conduct and Ethics" that is applicable to all directors, executive officers and employees and embodies our principles and practices relating to the ethical conduct of our business and our long-standing commitment to honesty, fair dealing and full compliance with all laws affecting our business. Our "Code of Business Conduct and Ethics" is available                    at https://ir.supermicro.com/governance/governance-documents/default.aspx. Any substantive amendment or waiver of the Code relating to executive officers or directors will be made only after approval by our Board of Directors and will be promptly disclosed on our website within four business days.

175. With respect to the proposal to amend the Plan, the December 2023 Proxy Statement stated the following, in relevant part:

> On November 30, 2023, upon recommendation by the Compensation Committee, the Board of Directors approved and adopted, subject to the approval of the Company's stockholders at the Annual Meeting, a further amendment and restatement of the Super Micro Computer, Inc. 2020 Equity and Incentive Compensation Plan in the form of the Amended Plan attached to this proxy statement.
>
> Stockholders previously approved the Original 2020 Plan and the Current 2020 Plan, which affords the Compensation Committee the ability to design compensatory awards that are responsive to the Company's needs and authorizes a variety of award types designed to advance the interests and long-term success of the Company by encouraging stock ownership among non-employee directors of the Company and employees (including officers) and certain consultants or other service providers of the Company and its subsidiaries. You are being asked to approve the Amended Plan.
>
> Stockholder approval of the Amended Plan would make available for awards under the Amended 2020 Plan an additional 1,500,000 shares of Common Stock, par value of $0.001 per share, of the Company ("Common Stock"), as described below and in the Amended Plan, with such amount subject to adjustment, including under the Amended Plan's share counting rules.
>
> ***
>
> ***Without the additional shares of Common Stock available for award under the Amended Plan, we believe the current shares available for award under the Current 2020 Plan will be fully utilized by January 2024.***

176. Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Liaw, Fairfax, Blair, and Chan caused the December 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's reported revenues, earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about related parties and related party transactions from investors. As a result of the foregoing,

the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

177. The December 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the December 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

178. As a result of Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Liaw, Fairfax, Blair, and Chan causing the December 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Lin, S. Liu, and Liaw to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) to appoint EY as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve the amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 1,500,000 shares.

### *December 8, 2023 Announcement*

179. Also on December 8, 2023, the Company announced that Defendant Liaw was joining the Company's Board. The announcement also detailed Defendant Liaw's history with Super Micro, his prior resignation and the circumstances surrounding it, and his return to Super Micro. In relevant part, the announcement stated:

> Mr. Liaw co-founded the Company in 1993. From the Company's founding until January 2018, Mr. Liaw was an employee and held various executive positions in the Company, including Senior Vice President of Worldwide Sales and Corporate Secretary. He was also a member of the Board of Directors from 1993 until January 2018. ***In January 2018, Mr. Liaw resigned from all his positions with the Company, including from the Board of Directors, during a period when the Company was not current in its filings with the Securities and Exchange Commission, and, following completion of an Audit Committee investigation, in connection with a restructuring of***

1
2
3
4
5
6
7

***the Company's sales organization as part of the Company's remediation of material weaknesses in its internal control over financial reporting***. From February 2018 until June 2020, Mr. Liaw was retired. From June 2020 until April 2021, Mr. Liaw was the president of 2CRSi Corporation, a company headquartered in Strasbourg, France that develops, produces and sells high-performance customized, environmentally-friendly servers. ***Mr. Liaw returned to the Company as a consultant in May 2021***, advising the Company with respect to business development matters. ***In August 2022, Mr. Liaw returned to full-time employment with the Company as Senior Vice President, Business Development.***

8

***January 29, 2024 Press Release and February 2, 2024 Form 10-Q***

9
10
11
12
13
14
15
16
17
18
19
20
21

180.   On January 29, 2024, the Company published a press release announcing its financial results for the quarterly period ended December 31, 2023 ("2Q24") (the "2Q24 Release"). Days later, on February 2, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for 2Q24 (the "2Q24 10-Q"). The 2Q24 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 2Q24 10-Q, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

22
23

181.   The 2Q24 Release and 2Q24 10-Q reported the Company's financial results for 2Q24 as follows:

24
25
26
27
28

• Net sales of $3.66 billion versus $2.12 billion in the first quarter of fiscal year 2024 and $1.80 billion in the same quarter of last year.
• Gross margin of 15.4% versus 16.7% in the first quarter of fiscal year 2024 and 18.7% in the same quarter of last year.
• Net income of $296 million versus $157 million in the first quarter of fiscal year 2024 and $176 million in the same quarter of last year.

• Diluted net income per common share of $5.10 versus $2.75 in the first quarter of fiscal year 2024 and $3.14 in the same quarter of last year.
• Non-GAAP diluted net income per common share of $5.59 versus $3.43 in the first quarter of fiscal year 2024 and $3.26 in the same quarter of last year.
• Cash flow used in operations for the second quarter of fiscal year 2024 of $595 million and capital expenditures of $15 million.

182.   In addition, the 2Q24 10-Q represented that "[t]here were no changes in our internal control over financial reporting during the quarter ended December 31, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

### *April 30, 2024 Press Release and May 6, 2024 Form 10-Q*

183.   On April 30, 2024, the Company published a press release announcing its financial results for the quarterly period ended March 31, 2024 ("3Q24") (the "3Q24 Release"). Days later, on May 6, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for 3Q24 (the "3Q24 10-Q"). The 3Q24 10-Q was signed by Defendants Liang and Weigand and contained SOX certifications signed by Defendants Liang and Weigand attesting that they had reviewed the 3Q24 10-Q, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report" and that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

184.   The 3Q24 Release and 3Q24 10-Q reported the Company's financial results for 3Q24 as follows:

• Net sales of $3.85 billion versus $3.66 billion in the second quarter of fiscal year 2024 and $1.28 billion in the same quarter of last year.
• Gross margin of 15.5% versus 15.4% in the second quarter of fiscal year 2024 and 17.6% in the same quarter of last year.

• Net income of $402 million versus $296 million in the second quarter of fiscal year 2024 and $86 million in the same quarter of last year.

• Diluted net income per common share of $6.56 versus $5.10 in the second quarter of fiscal year 2024 and $1.53 in the same quarter of last year.

• Non-GAAP diluted net income per common share of $6.65 versus $5.59 in the second quarter of fiscal year 2024 and $1.63 in the same quarter of last year.

• Cash flow used in operations for the third quarter of fiscal year 2024 of $1,520 million and capital expenditures of $93 million.

185.  In addition, the 3Q24 10-Q represented that "[t]here were no changes in our internal control over financial reporting during the quarter ended March 31, 2024, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

***August 6, 2024 Press Release***

186.  On August 6, 2024, the Company published a press release announcing its financial results for the fourth quarter and full 2024 Fiscal Year (the "4Q24 Release"). Among other things, the 4Q24 Release announced the following financial results:

• Net sales of $5.31 billion versus $3.85 billion in the third quarter of fiscal year 2024 and $2.18 billion in the same quarter of last year.

• Gross margin of 11.2% versus 15.5% in the third quarter of fiscal year 2024 and 17.0% in the same quarter of last year.

• Net income of $353 million versus $402 million in the third quarter of fiscal year 2024 and $194 million in the same quarter of last year.

• Diluted net income per common share of $5.51 versus $6.56 in the third quarter of fiscal year 2024 and $3.43 in the same quarter of last year.

• Non-GAAP diluted net income per common share of $6.25 versus $6.65 in the third quarter of fiscal year 2024 and $3.51 in the same quarter of last year.

• Cash flow used in operations for the fourth quarter of fiscal year 2024 of $635 million and capital expenditures of $27 million.

187.  In addition, the 4Q24 Release contained the following summary:

Net sales for the fiscal year ended June 30, 2024, were $14.94 billion versus $7.12 billion for the fiscal year ended June 30, 2023. Net income for fiscal year 2024 was $1.21 billion, or $20.09 per diluted share, versus $640 million, or $11.43 per diluted share, for fiscal year 2023. Non-GAAP net income for fiscal year 2024 was $1.34 billion, or $22.09 per diluted share, versus $673 million, or $11.81 per diluted share, for fiscal year 2023. Non-GAAP net

income for fiscal year 2024 adds back stock-based compensation expense of $135 million, net of the related tax effects of $93 million.

188.   The 4Q24 Release also quoted Defendant Liang, who claimed that "Supermicro continues to experience record demand of new AI infrastructures propelling fiscal 2024 revenue up 110% year over year to $14.9 billion and non-GAAP earnings per share up 87% to $22.09." With respect to Super Micro's future, Defendant Liang also stated the following:

> We are well positioned to become the largest IT infrastructure company, driven by our technology leadership including rack-scale DLC liquid cooling and business values of our new Datacenter Building Block Solutions. The investments in Malaysia and Silicon Valley expansions will further strengthen our supply chain, security, and economies of scale necessary for the growing AI revolution.

189.   The statements in ¶¶179-188 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's reported revenues, earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about related parties and related party transactions from investors. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

### *August 27, 2024 Hindenburg Report*

190.   The truth began to emerge on August 27, 2024 when Hindenburg published the Hindenburg Report. The Hindenburg Report disclosed that Hindenburg's "3-month investigation" into Super Micro revealed "glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and export control failures, and customer issues" at Super Micro. In particular, the Hindenburg Report disclosed that the Company had engaged in a fraudulent scheme with respect to its revenue recognition, which

included: (a) misallocating revenue to hardware sales instead of services in the quarter ending December 2020 to artificially inflate profit margins; (b) recording revenue prematurely, even when installation and delivery of equipment to customers was not feasible; and (c) booking revenue early for faulty or incomplete products not yet ready for sale. In relevant part, the Hindenburg report stated:

> All told, we believe Super Micro is a serial recidivist. It benefitted as an early mover but still faces significant accounting, governance and compliance issues and offers an inferior product and service now being eroded away by more credible competition.

191.    The Hindenburg Report revealed additional retails regarding the circumstances of the prior employment and subsequent retention of several key executives who departed Super Micro in a prior "accounting scandal" for which Super Micro was fined $17.5 million by the SEC. In relevant part, the Hindenburg Report stated:

> When we spoke to former Super Micro executives, they told us Wally Liaw presided over the sales teams that were involved in the previous accounting violations: "If you go back to Wally's team, every one of those [people] has their hand in that mess. You can promise yourself that"

> One former executive told us they had questioned the decision to rehire Wally, asking at the time: "***Why are we having this conversation about Wally coming back as a contractor?*** So when I saw him come back I had the same thought, like, wow, that's, uh, that's interesting."

> Normally, leaving amid an accounting scandal would be the end of an executive's association with a form. Yet a recent media report in April 2024 by Asia University, Taiwan, reported that Phidias Chou attended a Super Micro meeting with CEO Charles Liang, where Chou was vaguely identified as "deputy CEO." . . . In another article, describing the same meeting, he was simply referred to as a "consultant."
> . . .
> A former executive told us [that Salim Fedel was also associated with unlawful activities]: "He was involved with the restatement. He was one of the sloppy salespeople. He got fired because he was so aggressive." . . . Super Micro rehired him as Vice President of Business Development and Strategic Sales in October 2020, per his LinkedIn.

. . .

[Howard] Hideshima was rehired as a consultant in May 2023 to a related party entity of Super Micro called Ablecom Technology, according to his LinkedIn profile. Ablecom is led by Super Micro CEO Charles Liang's brother. Super Micro's CEO and his wife own 10.5%. The entity has hundreds of millions of dollars in transactions with Super Micro per year, per its 10-k.

. . .

Former employees explained how these rehires were borne out of long-standing relationships with CEO Charles Liang, who valued loyalty over all else. Per one former sales director: "I wouldn't take comfort in that. If people were let go because their practices were questionable, to bring them back would give me less comfort. I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after the delisting problem. Another sales director attributed it to nepotism: "They were hired back. And there was a lot of nepotism. I'm speaking freely."

192.    In addition, the Hindenburg Report revealed that the Company had never changed its mindset with respect to the issues with its accounting standards and instead continued to engage in channel stuffing,[7] stating:

"Our interviews with former employees corroborate that Super Micro continued recognizing incomplete sales as revenue after the SEC Settlement in 2020.

Pressure to meet quotas pushed salespeople to stuff the channel with distributors, using "partial shipments," per former sales director

. . .

[Former employees] told us salespeople worked with distributors of Super Micro, including Avnet and Tech Data to over-ship product to boost numbers, in what appeared to be a channel stuffing scheme. This resulted from sales teams being put under "massive pressure" from Charles Liang each quarter

. . .

Our interviews also corroborate further revenue recognition issues related to shipping highly defective products around quarter-end.

193.    The report also disclosed that Super Micro steadily rehired employees that it

---

[7] "Channel stuffing" occurs when a company inflates sales through over-shipping and over-invoicing products to customers or distributors who may not have ordered, needed, or been able to sell the products.

had initially filed due to their involvement in the revenue recognition scandal, including Defendant Liaw and Phidias Chou, both of whom sat on the Board before their resignation during the accounting scandal. The Hindenburg Report also quoted a former Super Micro senior salesperson who stated, with respect to the rehired executives, that "[a]lmost all of them are back. Almost all of the people that were let go that were the cause of this malfeasance." In addition, the report quoted a former salesperson who stated that "salespeople worked with distributors of Super Micro, including Avnet and Tech Data to over-ship product to boost numbers, in what appeared to be a channel stuffing scheme."

194.   The Hindenburg Report discussed potential issues with both the Company's disclosed related party dealings and undisclosed related party dealings, stating the following, in relevant part, with respect to the former:

> Ablecom was founded in 1997, per its website. Its CEO and largest shareholder is Steve (Jianfa) Liang, a younger brother of Super Micro's CEO Charles Liang, per the company's 2023 annual report. Steve Liang owns 28.8% of Ablecom shares along with unnamed "other family members." Super Micro CEO Charles Liang, and his wife, who is also a director at Super Micro, own 10.5% of Ablecom shares. An unnamed sibling of co-founder Wally Liaw owns 11.7%, per filings.

> Compuware was founded in 2004, per its website. Its CEO is Bill (Jianda) Liang, also a younger brother of Super Micro's CEO, per the company's 2023 10-K. Brother Steve Liang [of Ablecom] is also a director and shareholder of Compuware.

> As of April 2024, Bill Liang and his immediate family owned 15.83% of Compuware while elder brother Steve Liang and his wife and immediate family owned a much larger 37.67% stake, per shareholdings disclosed in filings by one of its investees. Ablecom owned a 15% stake in Compuware.

> Both Ablecom and Compuware are collocated with Super Micro's facility in Taiwan

> . . .

> [B]oth Ablecom and Compuware's global export sales appear highly concentrated on Super Micro and the U.S., based on available import-expert records via Tradesparq, which may not cover all import markets.

Our analysis of those records shows that of Ablecom's exports to the U.S., ~99.8% were to Super Micro between January 1st, 2020 and June 30th, 2024 (the end of Super Micro's fiscal year).

Reflecting a similar pattern, in the same period, 99.7% of Compuware's exports to the U.S. were to Super Micro, based on available Tradesparq data.

In short, these related party suppliers have almost no business in the U.S. – and apparently very little elsewhere in the world – apart from Super Micro, suggesting they were set up as extensions of the public company.

A former engineer at Ablecom confirmed the conclusions we drew from the trade data. They told us via written message: "Ablecom is a very special supplier of chassis and thermal module to SMC [Super Micro]…Ablecom has about 90%revenue comes from SMC [Super Micro]." The engineer also indicated that Super Micro CEO Charles Liang was the person calling the shots at Ablecom and Compuware: "SMC [Super Micro], Ablecom and Compuware have a regular operation meeting hosted by Charles Liang." They said the operation meeting was held monthly and went on to explain that "Steve [Liang] and Bill [Liang] are in charge of chassis and PSU [power supply unit], respectively."

195.   In its discussion of the Company's undisclosed related party dealings, the Hindenburg Report mentioned several companies that Super Micro has apparent involvement in, but has never disclosed to investors, including: Aeon Lighting Technology ("Aeon Lighting"), Aeon Biotech a/k/a Hongguo Biotechnology Co ("Aeon Biotech"), Abelestnet Technology Limited, Lambda Labs, and Leadtek. The report discussed, *inter alia*, how Aeon Lighting and Aeon Biotech were both operated by James (Jianguo) Liang, Defendant Liang's "third and youngest brother," and how he owned 85.7% of the shares of Aeon Lighting and "99% of Aeon Biotech." In relevant part, the Hindenburg Report stated:

In addition to producing LED lighting, [Aeon Lighting] also produces computer components and … specifically list chassis manufacturing, rail sliders, cooling systems, power supplies and metal prototyping as its product offering.

> Its company brochure prominently displays a Super Micro branded workstation chassis
>
> . . .
>
> Not only is Aeon Lighting in the server business, like Super Micro, Compuware and Ablecom, it also operates from the same location.
>
> Aeon's website also lists a job posting for a production role, located at "No. 306, Chang'an Street, Bade District, Taoyuan City" in Taiwan, the same address as Ablecom and Compuware's manufacturing facility, within the industrial campus it shares with Super Micro.
>
> James Liang's second company Aeon Biotech … seems to have pivoted from sterilization equipment to the server business.
>
> . . .
>
> A profile on leading Taiwanese job listing website states that Aeon Biotech is 'providing the most complete AI server design, research and development, and sales." The profile also states the company is located within the 'Supermicro AI Technology Park"

196.   With respect to Super Micro's other undisclosed, related party dealings, the Hindenburg Report stated the following, in relevant part:

> Super Micro CEO Charles Liang's other brother, Bill (Jianda) Liang, who runs a disclosed related party, Compuware, named in the previous part, is a shareholder and director of another Hong Kong entity called "Ablestnet Technology Limited"
>
> . . .
>
> Bill Liang is also the Chairman and 17% shareholder of another similarly-named entity in Taiwan called "Ablestnet Computer Inc" – which itself holds a 9.34% stake in Compuware . . .
>
> Both the Ablestnet Taiwan and Hong Kong entities appear to be undisclosed related-party suppliers or resellers for Super Micro
>
> . . .
>
> Despite selling almost identical products, offering OEM services and being located at the site of a related party, Compuware, neither Ablestnet's Taiwanese or Hong Kong Entites are mentioned in Super Micro's filings.
>
> . . .
>
> Lambda seems to have purchased hardware and datacenter space through Super Micro, without disclosure of the potential related party nature of the deal owing to a Super Micro investment.
>
> . . .

Ablecom and Compuware now own 19.85% and 9.93% of Leadtek . . .

Both of Charles Liang's brothers [Bill and Steve Liang] later took board seats at Leadtek on December 27th, 2023, per Leadtek filings.

Super Micro makes no reference to any transactions with Leadtek, despite advertising almost identical products, utilizing Super Micro parts on its website. We reached out to Leadtek's investor relations spokesperson, Michael Yang, to understand more about the relationship. He confirmed that Leadtek was using parts from Super Micro: "We will take their [Super Micro's] motherboard then take Ablecom's case then Compuware's power supply."
. . .
Given the circular nature of their relationship, the indirect ownership by Charles Liang and the close ties to Super Micro, this appears to be a de facto, undisclosed related party.

197. Moreover, the report revealed that, despite Defendants' claims of a "competitive edge" in liquid cooled solutions, Super Micro allegedly represented Ablecom's liquid cooling solutions to be its own during the 2022 SuperComputing Conference in Dallas. In relevant part, the report stated, "In short, Super Micro's related party 'contract manufacturer' to whom it outsources basic component manufacturing and assembly might also be designing its liquid-cooling solutions, which are being touted as proprietary."

198. The Hindenburg Report also disclosed that the Company had violated various U.S. export controls. Indeed, despite Defendants having repeatedly claimed throughout the Relevant Period that Super Micro had halted its sales to Russia following the 2022 invasion of Ukraine, the Hindenburg Report disclosed that, between February 24, 2022 and June 30, 2024, the Defendants had participated in the Export Control Misconduct, circumventing U.S. export controls and ***shipping approximately $210 million worth of products to Russia***. In relevant part, the Hindenburg Report stated:

***Super Micro products have been shipped to Russia in larger-than-ever volumes since the invasion of Ukraine***, based on our analysis of more than

45,000 import and export transactions provided by trade aggregator Tradesparq.

. . .

In calendar year 2023, exports of Super Micro products to Russia rose to $126.6 million – 9.6x higher than in 2021 – per Tradesparq data. *That value was equivalent to 4.9% of Super Micro's total worldwide sales, excluding the U.S., in calendar 2023*, per filings

. . .

We believe that all the common-sense indicators suggest that Super Micro continued to knowingly supply one of its longstanding Russian customers first via a California distributor operated by a key executive of one of its authorized partners and later via a web of Turkish shell companies.

Trade data shows Super Micro exporting goods directly to Niagara until February 24th, 2022, the day Russia invaded Ukraine.

Then between July 12th, 2022 and February 8th, 2023, a California entity named Business Development International took over exports of Super Micro products to Niagara – in apparent contravention of U.S. trade restrictions – per import-export data.

In just a little more than 6 months, Business Development International shipped more than $5.8 million of "computing machine devices", "data processing blocks" and "parts and accessories" solely to Niagara Computers in Russia, per Tradesparq.

. . .

Just as California-based Business Development International's export operations were winding down, three recently-created Turkish companies took over shipping Super Micro products to Niagara.

The largest, Koc Gemicilik Ve Tasimacilik, was incorporated on January 11, 2022 – about five weeks before Russia invaded Ukraine, per the Turkish corporate gazette

. . .

Between March 6, 2023 and December 21, 2023, Koc Gemicilik Ve Tasimacilik exported $32.1 million of Super Micro products solely to Niagara in Russia, per Tradesparq.

In June 2024, Koc Gemicilik Ve Tasimacilik was placed under U.S. sanctions for its role in smuggling restricted items to Russia.

The other two export intermediaries, Alfament Yazilim Teknoloji and AMD Ithalat Ihracat were both incorporated in Turkey within two months of the Russian invasion of Ukraine, per the Turkish corporate gazette.

Neither entity nor their sole shareholders appear to have any significant online presence.

Between January 2023 and October 2023, those two entities shipped a combined $8.3 million of Super Micro components to Niagara, per Tradesparq. The vast majority of those products corresponded to HS trade prefix 8471.50 – items the U.S. says are being diverted for military use.

Newly-created Turkish entities, run by Ukrainian and Russian citizens, with little or no trading history and little or no online presence would have been an unmissable warning sign during even the most rudimentary due diligence and export compliance.

. . .

Between November 2, 2022 and November 14, 2023, Beiliande [an "Authorized Partner" of SMCI via its partnership program] exported Super Micro products with a declared customs value of approximately $10.25 million to Russia – via both its Shenzhen and Hong Kong operations, per Tradesparq.

The largest single Russian customer supplied by Beiliande was called Asilan, based in St Petersburg, which received goods with a declared customs value of about $3.6 million, per Tradesparq.

. . .

Asilan states on the website that it is a partner of Super Micro, provides a link to Super Micro in Holland and features photos with Asilan personnel carrying boxes marked with the Super Micro logo. Its website features multiple links to what it says are Super Micro servers and data storage systems.

. . .

Moscow-based IT distributor Vneshekostil received about $29.4 million of Super Micro products following Russia´s 2022 invasion of Ukraine, per Tradesparq. It appears to have had no prior trading relationship with Super Micro and received most of the components via a Hong Kong exporter created seven weeks after the war began.

Vneshekostil was sanctioned by the U.S. in September 2023 after it became "one of the largest importers of dual-use chips into Russia", per the U.S. Treasury.

Verified Shareholder Derivative Complaint

199.   On this news, the price per share of the Company's stock dropped 2.64%, to close at a price of $547.64 per share on August 27, 2024.

***August 28, 2024 Press Release***

200.   Later, on August 28, 2024, the Company published a press release revealing that it would delay the filing of its annual report on Form 10-K with the SEC for the 2024 Fiscal Year, as Super Micro was examining the "design and operating effectiveness of its internal controls over financial reporting." The press release stated the following, in relevant part:

> Super Micro . . . today announced that it expects that ***it will not timely file its Annual Report on Form 10-K*** for the fiscal year ended June 30, 2024 (the "Annual Report") and expects to file a Notification of Late Filing on Form 12b-25 with respect to the Annual Report on August 30, 2024. SMCI ***is unable to file its Annual Report*** within the prescribed time period without unreasonable effort or expense. ***Additional time is needed for SMCI's management to complete its assessment of the design and operating effectiveness of its internal controls over financial reporting*** as of June 30, 2024. SMCI has not made updates to its results for the fiscal year and quarter ended June 30, 2024 that were announced in SMCI's press release dated August 6, 2024.

201.   On this news, the price per share of the Company's stock fell 19.02%, from a closing price of $547.64 per share on August 27, 2024 to close at a price of $443.49 per share on August 28, 2024.

***September 26, 2024 Wall Street Journal Report***

202.   The truth continued to emerge on September 26, 2024 when *The Wall Street Journal* published an article reporting that the DOJ had begun an investigation into the Company, which reportedly focused on allegations made by a whistleblower and former Super Micro employee who accused Super Micro of accounting violations.

203.   On this news, the price per share of the Company's common stock fell 12.17%, from a closing price of $458.10 on September 25, 2024 to close at a price of $402.40 per share on September 26, 2024.

*October 30, 2024 Form 8-K*

204.    The truth fully emerged on October 30, 2024 when the Company filed a Form 8-K with the SEC revealing that EY had resigned from its position as Super Micro's auditor while conducting Super Micro's audit for the 2024 Fiscal Year.

205.    The 8-K stated that EY "was engaged on March 15, 2023 to perform an audit" for Super Micro's 2024 Fiscal Year but, in July 2024, had "communicated to the Audit Committee concerns about several ***matters relating to governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting***" and further that, due to the foregoing, "the timely filing of the Company's annual report was at significant risk."

206.    In response to this communication, Super Micro reported in the 8-K that the Board appointed the "Special Committee to conduct the Review. However, "[a]fter receiving additional information through the Review process," the 8-K revealed that "***EY informed the Special Committee that the additional information EY received raised questions,***" including about whether Super Micro "***demonstrates a commitment to integrity and ethical values consistent with Principle 1 of the COSO Framework,***"; about "***the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management in accordance with Principle 2 of the COSO Framework,***; and about "***whether EY could rely on representations from certain members of management and from the Audit Committee.***"

207.    In relevant part, the Form 8-K stated:

On October 24, 2024, Ernst & Young LLP ("EY") sent the members of the Audit Committee a letter of resignation as the Company's registered public accounting firm (the "Resignation Letter").

\*\*\*

EY was engaged on March 15, 2023 to perform an audit for the Company's fiscal year ending June 30, 2024, and has not issued any report on the Company's financial statements or the Company's internal control over financial reporting. EY resigned while conducting the audit for the

Company's fiscal year ended June 30, 2024, EY's first audit on the Company's behalf.

In late July 2024, EY communicated to the Audit Committee concerns about several matters relating to governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting, and that the timely filing of the Company's annual report was at significant risk. In response, the Board appointed an independent special committee of the Board (the "Special Committee") to review the matters and certain of the Company's internal controls and certain governance procedures (the "Review"). The Special Committee engaged Cooley LLP, and forensic accounting firm Secretariat Advisors, LLC to perform an investigation on behalf of and at the direction of the Special Committee. EY and the Board received updates with preliminary information relating to the Review. As of the date of this Current Report on Form 8-K, the Review remains ongoing and final findings and recommendations have not yet been communicated to EY or the Board.

***After receiving additional information through the Review process, EY informed the Special Committee that the additional information EY received raised questions, including about whether the Company demonstrates a commitment to integrity and ethical values consistent with Principle 1 of the COSO Framework, about the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management in accordance with Principle 2 of the COSO Framework, and whether EY could rely on representations from certain members of management and from the Audit Committee.***

208.   EY wrote in its resignation letter that, "We are resigning due to information that has recently come to our attention ***which has led us to no longer be able to rely on management's and the Audit Committee's representations and to be unwilling to be associated with the financial statements prepared by management, and after concluding we can no longer provide the Audit Services in accordance with applicable law and professional obligations.***"

209.   On this news, the price per share of the Company's stock fell $16.05, or approximately 33%, from a closing price of $49.12 on October 29, 2024 to close at a price

of $33.07 on October 30, 2024.

## REPURCHASES

210.    During the Relevant Period, the Individual Defendants caused Super Micro to initiate repurchases of its own common stock at artificially inflated prices, substantially damaging Super Micro.

211.    On August 3, 2022, following the expiration of a previous share repurchase program on July 31, 2022, one of the Board's duly authorized subcommittees approved a new share repurchase program to repurchase shares of Super Micro's common stock for up to $200 million at prevailing prices in the open market. In the 2023 10-K, Super Micro represented that "[d]uring the fiscal year ended June 30, 2023, the Company repurchased and retired 1,553,350 shares of common stock for an aggregated *$150 million.* As of June 30, 2023, $50.0 million was available for additional repurchases of common stock."

## DAMAGES TO SUPER MICRO

212.    As a direct and proximate result of the Individual Defendants' conduct, Super Micro has lost and will continue to lose and expend many millions of dollars.

213.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

214.    Such losses include the Company's overpayment for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

215.    Such expenditures include, but are not limited, to costs related to the DOJ's investigation into the Company.

216.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein,

including the Export Control Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

217. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

218. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

219. As a direct and proximate result of the Individual Defendants' conduct, Super Micro has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

220. Plaintiff brings this action derivatively and for the benefit of Super Micro to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Super Micro, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Liang and Weigand.

221. Super Micro is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

222. Plaintiff is, and has been at all relevant times, a shareholder of Super Micro. Plaintiff will adequately and fairly represent the interests of Super Micro in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

223.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

224.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Super Micro's Board consisted of the following nine individuals: Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Liaw, Fairfax, and Blair (the "Director-Defendants") and non-party Susie Giordano (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time this action was filed.

225.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to participate in the Export Control Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

226.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Super Micro to issue materially false and misleading statements. Specifically, the Director-Defendants caused Super Micro to issue false and misleading statements which were intended to make Super Micro appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

227.    Additional reasons that demand on Defendant Liang is futile follow. Defendant Liang co-founded Super Micro and has served as the Company's President, CEO, and Chairman of the Board since its inception in September 1993. The Company

provides Defendant Liang with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and Chairman of the Board, Defendant Liang was ultimately responsible for the Company's engagement in the Export Control Misconduct and issuance of false and misleading statements during the Relevant Period, including the false and misleading 2021, 2022, and 2023 10-Ks, all of which he signed and made SOX certifications for. In addition, Defendant Liang solicited the false and misleading 2022, April 2023, and December 2023 Proxy Statements, which led to, *inter alia*, shareholders voting to: (1) reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve amendments to the Plan, increasing the number of shares available for issuance thereunder by 2,000,000 shares (per the 2022 Proxy Statement) and 1,500,000 shares (per the December 2023 Proxy Statement). As the Company's highest officer and Chairman of the Board, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Export Control Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Liang is named as a defendant in the Securities Class Actions. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate his motive in facilitating and participating in the scheme. In addition, Defendant Liang caused Super Micro to enter into related party transactions with entities controlled by his siblings (as alleged herein), and Defendant Liang is not independent from Defendant S. Liu as they are spouses and would not institute a lawsuit against one another. For these reasons, Defendant Liang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

228.   Additional reasons that demand on Defendant Tuan is futile follow. Defendant

Tuan has served as a Company director since February 2007. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Tuan has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Tuan solicited the false and misleading 2022, April 2023, and December 2023 Proxy Statements, which led to, *inter alia*, shareholders voting to: (1) reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve amendments to the Plan, increasing the number of shares available for issuance thereunder by 2,000,000 shares (per the 2022 Proxy Statement) and 1,500,000 shares (per the December 2023 Proxy Statement). He also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Export Control Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Tuan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

229. Additional reasons that demand on Defendant T. Liu is futile follow. Defendant T. Liu has served as a Company director since January 2019. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. Defendant T. Liu has received and continues to receive compensation for his role as a director as described above. In addition, Defendant T. Liu solicited the false and misleading 2022, April 2023, and December 2023 Proxy Statements, which led to, *inter alia*, shareholders voting to: (1) reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve amendments to the Plan, increasing the number of shares available for issuance thereunder by 2,000,000 shares (per the 2022 Proxy Statement) and 1,500,000 shares (per

the December 2023 Proxy Statement). He also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Export Control Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant T. Liu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

230.    Additional reasons that demand on Defendant Liaw is futile follow. Defendant Liaw co-founded Super Micro in 1993 and has served as a Company director since December 2023. He previously served as a Company director from 1993 until January 2018. In addition, Defendant Liaw solicited the false and misleading December 2023 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve amendments to the Plan, increasing the number of shares available for issuance thereunder by 1,500,000 shares. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Export Control Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Liaw breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

231.    Additional reasons that demand on Defendant Blair is futile follow. Defendant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Blair has served as a Company director since December 2022. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Blair has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Blair solicited the false and misleading April and December 2023 Proxy Statements, which led to, *inter alia*, shareholders voting to: (1) reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve amendments to the Plan, increasing the number of shares available for issuance thereunder by 1,500,000 shares. He also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Export Control Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Blair breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

232.    Additional reasons that demand on Defendant Lin is futile follow. Defendant Lin has served as a Company director since April 2022. She also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Lin has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Lin solicited the false and misleading  2022, April 2023, and December 2023 Proxy Statements, which led to, *inter alia*, shareholders voting to: (1) reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve amendments to the Plan, increasing the number of shares available for issuance thereunder by 2,000,000 shares (per the 2022 Proxy Statement) and 1,500,000 shares (per the December 2023 Proxy Statement). She also signed the false and misleading 2022 and

2023 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Export Control Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Lin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

233.    Additional reasons that demand on Defendant S. Liu is futile follow. Defendant S. Liu co-founded Super Micro in 1993 and has served as a Company director since its inception. She also serves as the Company's Senior Vice President. Thus, as the Company admits, she is a non-independent director. Defendant S. Liu has received and continues to receive compensation for her role as a director as described above. In addition, Defendant S. Liu solicited the false and misleading 2022, April 2023, and December 2023 Proxy Statements, which led to, *inter alia*, shareholders voting to: (1) reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve amendments to the Plan, increasing the number of shares available for issuance thereunder by 2,000,000 shares (per the 2022 Proxy Statement) and 1,500,000 shares (per the December 2023 Proxy Statement). She also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Export Control Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant S. Liu has three family members that are employed by Super Micro in San Jose, California, and Defendant S. Liu is not independent from Defendant Liang as they are spouses and would not institute a lawsuit against one another. In addition, her insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, also demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant S. Liu breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

234.   Additional reasons that demand on Defendant Fairfax is futile follow. Defendant Fairfax has served as a Company director since January 2019. He also serves as a member of the Audit Committee and the Compensation Committee. Defendant Fairfax has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Fairfax solicited the false and misleading 2022, April 2023, and December 2023 Proxy Statements, which led to, *inter alia*, shareholders voting to: (1) reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve amendments to the Plan, increasing the number of shares available for issuance thereunder by 2,000,000 shares (per the 2022 Proxy Statement) and 1,500,000 shares (per the December 2023 Proxy Statement). He also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Export Control Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Fairfax breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

235.   Additional reasons that demand on the Board is futile follow.

236.   Additional reasons that demand on the Director-Defendants is futile follow. Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Fairfax, Tseng, and Chan solicited the false

and misleading 2022 Proxy Statement, and Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Liaw, Fairfax, Blair, and Chan solicited the false and misleading December 2023 Proxy Statement, which led Company shareholders to, inter alia, approve the amendments to the Plan, thereby increasing the number of shares of Company common stock available for issuance thereunder by 2,000,000 shares and 1,500,000 shares, respectively, and allowing the Director-Defendants to receive material benefits thereunder in the future. The Director-Defendants are unlikely to take action against those among them that solicited the 2022 and December 2023 Proxy Statements since their issuances caused shareholders to approve the amendments to the Plan, and since the Director-Defendants now have the opportunity to materially benefit therefrom in the future. The Director-Defendants are unlikely to call into question any benefits received pursuant to the issuance of the 2022 and December 2023 Proxy Statements, thus making demand against them futile.

237.    Defendants Fairfax, T. Liu, Lin, and Blair (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Moreover, in explaining its reasons for resigning as the Company's auditor for the 2024 Fiscal Year, EY disclosed that the information it had received from the Review "*raised questions,*" including about *"the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the*

*CEO and other members of management in accordance with Principle 2 of the COSO Framework,*; and about "*whether EY could rely on representations from certain members of management and from the Audit Committee.*" Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

238.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

239.   Super Micro has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Super Micro any part of the damages Super Micro suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

240.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions

challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

241.   The acts complained of herein constitute violations of fiduciary duties owed by Super Micro's officers and directors, and these acts are incapable of ratification.

242.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Super Micro. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Super Micro, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

243.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Super Micro to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

244.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FIRST CLAIM

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

245.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

246.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

247.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

248.    Under the direction and watch of the Individual Defendants, the 2022, April 2023, and December 2023 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

249.    The Proxy Statements also failed to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's reported revenues,

earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about related parties and related party transactions from investors. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

250.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to the reelection of directors to the Board and the amendments to the Plan.

251.    As a result of Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Fairfax, Tseng, and Chan causing the 2022 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Chan and Fairfax to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve the amendment and restatement of the Plan to increase the number of shares available for issuance thereunder by 2,000,000 shares.

252.    As a result of Defendants Liang, Tuan, T. Liu, Blair, Lin, S. Liu, Fairfax, and Chan causing the April 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Liang, Tuan, and T. Liu to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of Super Micro's named executive officers.

253.    As a result of Defendants Liang, Tuan, T. Liu, S. Liu, Lin, Liaw, Fairfax, Blair, and Chan causing the December 2023 Proxy Statement to be false and misleading,

shareholders voted, *inter alia*, to: (1) reelect Defendants Lin, S. Liu, and Liaw to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) appoint EY as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve the further amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 1,500,000 shares.

254.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2022, April 2023, and December 2023 Proxy Statements.

255.    Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

256.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257.    The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding Super Micro. Not only is Super Micro now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Super Micro by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Super Micro.

258.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

259.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Super Micro not misleading.

260.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Super Micro.

261.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

262.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

263.   Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

264.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.   The Individual Defendants, by virtue of their positions with Super Micro and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Super Micro and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Super Micro to engage in the illegal conduct and practices complained of herein.

266.   Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

267.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

268.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Super Micro's business and affairs.

269.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

270.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Super Micro.

271.   In breach of their fiduciary duties owed to Super Micro, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Defendants were participating in the Export Control Misconduct; (2) the Company's reported revenues, earnings, and other financial figures were materially misstated in violation of GAAP; (3) the Company had ineffective internal controls over financial reporting; and (4) Defendants concealed material information about related

parties and related party transactions from investors. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

272.   In further breach of their fiduciary duties, the Individual Defendants participated and/or caused the Company to participate in the Export Control Misconduct and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

273.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

274.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

275.   In yet further breach of their fiduciary duties, during the Relevant Period, four of the Individual Defendants engaged in lucrative insider sales while the stock prices were artificially inflated before the fraud was exposed, netting proceeds of approximately $3.2 million.

276.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Super Micro's securities.

277.   The Individual Defendants had actual or constructive knowledge that they had

caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Super Micro's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

278.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

279.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Super Micro has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

280.    Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Unjust Enrichment

281.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

282.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Super Micro.

283.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Super Micro that was tied to the performance or artificially inflated valuation of Super Micro, or

received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

284.   Plaintiff, as a shareholder and a representative of Super Micro, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

285.   Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Abuse of Control

286.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

287.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Super Micro, for which they are legally responsible.

288.   As a direct and proximate result of the Individual Defendants' abuse of control, Super Micro has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

289.   Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Gross Mismanagement

290.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

291.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

duties with regard to prudently managing the assets and business of Super Micro in a manner consistent with the operations of a publicly held corporation.

292.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Super Micro has sustained and will continue to sustain significant damages.

293.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

294.    Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

### EIGHTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

295.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

296.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

297.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

298.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Super Micro to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

299.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

300.    Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NINTH CLAIM
### Against Defendants Liang and Weigand for Contribution Under Sections 10(b) and 21D of the Exchange Act

301.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

302.    Super Micro and Defendants Liang and Weigand are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Liang's and Defendant Weigand's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

303.    Defendants Liang and Weigand, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

304.    Accordingly, Defendants Liang and Weigand are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

305.    As such, Super Micro is entitled to receive all appropriate contribution or indemnification from Defendants Liang and Weigand.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

      (a)    Declaring that Plaintiff may maintain this action on behalf of Super Micro, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Super Micro;

(c)    Determining and awarding to Super Micro the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Super Micro and the Individual Defendants to take all necessary actions to reform and improve Super Micro's corporate governance and internal procedures to comply with applicable laws and to protect Super Micro and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Super Micro to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Super Micro restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

1

2      Dated: November 14, 2024                Respectfully submitted,

3                                              **THE BROWN LAW FIRM, P.C.**

4

5                                              */s/*_____

6                                              Robert C. Moest, Of Counsel, SBN 62166
                                               2530 Wilshire Boulevard, Second Floor
7                                              Santa Monica, CA 90403
                                               Telephone: (310) 915-6628
8                                              Facsimile: (310) 915-9897
                                               Email: RMoest@aol.com
9

10                                             **THE BROWN LAW FIRM, P.C.**

11                                             Timothy Brown
                                               767 Third Avenue, Suite 2501
12                                             New York, NY 10017
                                               Telephone: (516) 922-5427
13                                             Facsimile: (516) 344-6204
                                               Email: tbrown@thebrownlawfirm.net
14

15                                             *Counsel for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Anand Roy, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 13__ day of November, 2024.

DocuSigned by:

*Anand Roy*

24166DD16B9A4F5...

Anand Roy